**FEDWAY ASSOCIATES, INC., et al.**

v.

**UNITED STATES TREASURY, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, Respondent.**

**No. 91–1382.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1992.

Decided Oct. 23, 1992.

Alan N. Sutin, with whom William J. MacKnight, Jr. and William B. Schreiber, New York City, were on the brief, for petitioners.

James W. Lowe, Attorney, Dept. of Justice, with whom Robert B. Nicholson, Washington, D.C., was on the brief, for respondent.

T. Raymond Williams, Nathalie F.P. Gilfoyle, and Ronald A. Bloch, Washington, D.C., were on the brief, for amici curiae.

Before: EDWARDS, RUTH BADER GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Fedway and its affiliates are wholesale traders in distilled spirits. In 1986, Fedway initiated a moderately successful, short-term promotion to increase the sales of its vodka and rum to retail establishments. In brief, Fedway offered retailers consumer electronic goods, including televisions and VCRs, if they agreed to buy certain quantities of specified liquor; the more cases a retailer purchased, the greater in value the electronic good.

There is little doubt that this kind of promotion, if conducted in any other industry, would be lawful under the antitrust laws; the dispositive issue in this case is whether the promotion nonetheless violates a statute designed to impose uniquely strict regulations on the alcohol industry. *See* Federal Alcohol Administration Act (FAAA or Act), 27 U.S.C. §§ 201–12 (1988). More specifically, the issue is whether Fedway's promotion should be deemed—as stated in pertinent provisions of the Act—to have unlawfully "exclu[ded]," at least in part, the liquor sales of rival wholesalers. We hold that Congress, whatever else it intended by the term "exclusion," did not intend to prohibit the kind of promotion at issue in this case.

## I. Background

Fedway's promotional campaign lasted for three months, during which retailers were offered—on a non-discriminatory basis—certain consumer electronic goods if they agreed to purchase designated quantities of Finlandia vodka or Captain Morgan spiced rum. As described by the Bureau, retailers would get a microwave oven for purchasing five cases of the liquor from Fedway; a thirteen-inch color television for ten cases; a compact disc player for fifteen cases; and a VCR for twenty-five cases. The wholesale value of these items ranged from $104 to $280. The retailers were under no obligation to participate. If they chose to participate, they would not be bound by contract to buy less vodka or rum from Fedway's rivals. The promotion placed no restrictions on how or where retailers used the incentive equipment; a TV or VCR could be used on the retailer's premises (a popular choice for bar owners) or given to an employee for use at home. The case against Fedway rests solely on this single campaign. No prior or subsequent Fedway promotion figures in the record we are called upon to review.

The three-month promotion successfully boosted Fedway's sales of Finlandia vodka and Captain Morgan spiced rum. Several retailers testified that the promotion led them to buy more cases of Fedway's liquor than they otherwise would have; a few even bought enough cases to qualify for more than one electronic gadget. Most important, many of these same retailers also testified that their increased purchases of Fedway liquor in turn led them to purchase less vodka and rum distributed by rival wholesalers.[1]

In 1989, the Bureau of Alcohol, Tobacco and Firearms (Bureau or BATF)—the agency charged with administering the Federal Alcohol Administration Act—endeavored to suspend Fedway's permits because the promotion, BATF asserted, violated certain of the Act's provisions. Upon the passage of the Twenty–First Amendment in 1933, Congress sought to guard against corruption of the newly-legal alcohol industry by bootleggers, racketeers, and other criminal types who had flourished during Prohibition. The unique threat that these criminal types posed to the renascent liquor trade led Congress to conclude that existing laws—antitrust laws in particular—were inadequate. The FAAA, passed in 1935, was the result. The Act prohibits or regulates, among other things, exclusive retail outlets, bulk retail sales, and interlocking directorates.

BATF specifically charged that Fedway's promotion violated the statute's similarly composed "tied house" and "commercial bribery" provisions. In pertinent part, the

---

**1.** Some retailers explained that they bought more rival liquor products during Fedway's promotion than they had in previous months (due to a general surge in liquor consumption), but *not as much more* as the retailers would have bought absent the promotion.

provisions make it unlawful for a wholesaler to "induce" a retailer to purchase its alcohol products *"to the exclusion in whole or in part"* of alcohol products distributed by rival wholesalers. 27 U.S.C. § 205(b)(3) (the "tied house" provision) (emphasis added); *id.* at § 205(c) (the "commercial bribery" provision) (emphasis added); *see also* 27 C.F.R. § 6 (implementing regulations under the "tied house" provision); *id.* at § 10 (implementing regulations under the "commercial bribery" provision). These provisions additionally require that the "induce[ment]" meeting the "exclusion" criterion involve one of several specified wholesaler practices; those practices include the giving away of an item of value.[2] The basic "exclusion" requirement is pivotal in this case.[3]

The Administrative Law Judge found, *inter alia,* that Fedway's promotional campaign did induce retailers to purchase more vodka and rum from Fedway than they otherwise would have and, as a result, to purchase less from rival wholesalers than the retailers otherwise would have. Nonetheless, the ALJ concluded, the purchases from Fedway were not to the "exclusion," even in part, of the vodka or rum sales of rival wholesalers—as that key term, "exclusion," was interpreted in *Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco and Firearms,* 860 F.2d 229 (7th Cir.1988) (holding that "tied house" and "commercial bribery" provisions do not bar wholesaler from buying space—on a non-exclusive basis—in retailer's weekly newspaper advertisements). The *Foremost* court ruled that "exclusion"

does not occur—as BATF would have it—merely because an inducement ultimately leads a participating retailer to buy less of a rival product. A determination that a rival product is "exclu[ded]," the *Foremost* court held, depends upon a "threshold" showing that the "purpose or potential effect [of the inducement in question] is to lead to supplier control over ostensibly independent purchasers." *Id.* at 237. In so ruling, the *Foremost* court relied heavily on this court's exhaustive reading of the Act's legislative history in *National Distributing Co. v. United States Treasury Dep't, Bureau of Alcohol, Tobacco and Firearms,* 626 F.2d 997 (D.C.Cir.1980) (holding that the "tied house" provision does not bar below-cost price cuts). Guided by *Foremost* and *National Distributing,* the ALJ reasoned that because BATF failed to show that Fedway's promotion potentially threatened retailer independence, the promotion could not be held unlawful under the "tied house" or "commercial bribery" provisions.

BATF's Director reversed the ALJ's decision. While the Director acknowledged his acceptance of our holding in *National Distributing* that the "tied house" provision does not bar below-cost price cuts, he distinguished the case on the grounds that Congress did not intend the FAAA to cover inducements specifically involving price. The Director further maintained that the Seventh Circuit in *Foremost* had wrongly superimposed a strict threshold requirement onto the statute.[4] In the Director's view, to establish a violation, it suffices to

---

**2.** In pertinent part, the "tied house" provision covers the giving away of "equipment, fixtures, signs, supplies, money, services, or other thing[s] of value." 27 U.S.C. § 205(b)(3) (emphasis added). The "commercial bribery" provision covers the "offering or giving [of] any bonus, premium, or compensation to any officer, or employee, or representative" of the retailer. *Id.* at § 205(c).

**3.** Fedway contends that a consumer electronic good is not a "thing of value" under the "tied house" provision, *see supra* note 2, but we reject that argument as contrary to the statute's plain meaning. *See infra* text accompanying note 11. As for the "commercial bribery" provision, neither the Administrative Law Judge nor BATF's

Director made a formal finding that a consumer electronic good is a "bonus, premium, or compensation." The assumption of both parties seems to be that it is. In any event, Fedway has not raised an objection to this characterization.

**4.** The Director's position here reaffirms the position he had adopted in an industry circular distributed not long after the *Foremost* decision. *See* ATF Indus. Circular 89–4, 2 Liquor Cont. L.Rep. (CCH) ¶ 41,249 (May 11, 1989). The circular had expressed its strong disapproval of *Foremost* and announced that BATF would abide by the *Foremost* court's interpretation of the "exclusion" requirement only within the Seventh Circuit.

show that a wholesaler "influenc[ed] (via specifically listed methods) a retailer's buying decisions." Order of the Director, Bureau of Alcohol, Tobacco and Firearms, No. CC:DC:NA–18,178 (June 19, 1991), *reprinted in* Joint Appendix (J.A.) at 8, 37. Most importantly, the Director held that a showing of "influenc[e]" could be made on the basis of the *single* datum, indisputably present in Fedway's case, that the suspect wholesaler "obtained sales that ... [but for the inducement] would have gone to competitors." *Id.,* J.A. at 41. Accordingly, the Director ordered a seven-day suspension of Fedway's permits.

Fedway has petitioned this court for review principally of the Director's interpretation of the "exclusion" requirement.

## II. Discussion

### A. "Exclusion"

■ The petition for review questions the validity of an agency's interpretation of a statute that Congress charged the agency with administering; the case therefore calls for the familiar two-step analysis under *Chevron. See Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Natural Resources Defense Council, Inc. v. Reilly,* 976 F.2d 36, 40 (D.C.Cir.1992) (applying the *Chevron* analysis). In the first step, a court uses traditional tools of statutory construction to try to determine what Congress meant by the specific phrase or term under scrutiny. If the court is successful in its search for a single, clear meaning, that is the end of the matter. To the extent that Congress' intent is not found clear, however, the second part of the *Chevron* analysis instructs courts to defer to the agency's interpretation of the phrase or term so long as the interpretation represents a reasonable construction of the statute. *See Page v. Pension Benefit Guaranty Corp.,* 968 F.2d 1310, 1315 (D.C.Cir.1992).

Applying the first part of the *Chevron* analysis, we hold that whatever else Congress meant by including an "exclusion" requirement, Congress could *not* have meant to prohibit an inducement *merely* because it ultimately leads a retailer to purchase less of a rival product than the retailer otherwise would have. Both the statutory text and the relevant legislative history signal that Congress intended the "exclusion" criterion to direct the regulator to determine something more. Congress, we are satisfied, used "exclusion" to indicate placement of retailer independence at risk by means of a "tie" or "link" between the wholesaler and the retailer or by any other means of wholesaler control.

■ Looking first to the face of the statute, the court finds persuasive Fedway's appeal to the "plain meaning" of the term "exclusion": to exclude a rival product connotes taking some *direct* action that pushes the rival out of the market, i.e., that bars the rival; to exclude a rival does not usually mean taking some action that merely leads *someone else*—here, a retailer—to make a free economic choice not to purchase the rival. *See* THE NEW WEBSTER ENCYCLOPEDIC DICTIONARY OF THE ENGLISH LANGUAGE 306 (1971) (defining "exclusion" as "[t]he act of excluding, shutting out, debarring, expelling, excepting, or rejecting"). Perhaps most persuasive are the very titles of the provisions at issue: *"tied house"* and *"commercial bribery."* These terms hardly suggest that Congress meant to prohibit inducements in gross, without any showing of jeopardy to retailer independence. We are also mindful of the title of a companion provision in section 205 of the FAAA, *"exclusive* outlets." *See* 27 U.S.C. § 205(a) (prohibiting exclusivity agreements between wholesalers and retailers) (emphasis added). This usage shows legislative awareness of the commonplace anti-competitive connotations of the term "exclusion" and its derivatives.[5]

5. Fedway also points to the fact that the short-lived predecessor to the FAAA—the Code of Fair Competition for the Alcoholic Beverages Industry, *see* Executive Order No. 6474 (Dec. 4, 1933)—never mentioned the term "exclusion" in its analogous provisions and thus seemed to prohibit any inducement involving the giving away of an item of value. Fedway infers from

The relevant legislative history strongly supports our reading of the plain meaning of the text. In *National Distributing*, this court exhaustively examined the legislative history, *see* 626 F.2d at 1004–12, and concluded that "the essence of the 'tied house evil' was vertical integration." *Id.* at 1009.[6] The court in *National Distributing*, we acknowledge, did not have as its immediate assignment review of the administrator's definition of the term "exclusion"; rather, the court's task was to determine whether below-cost price cuts count as one of the specified activities covered by the "tied house" and "commercial bribery" provisions.[7] The *National Distributing* court's statements regarding Congress' purposes, however, appear to us fully applicable in the present context. Without retreading ground well covered in the *National Distributing* opinion, we point up a Senate Report observation typical of the many statements in the legislative record: the practices prohibited by section 205 are "those which tended to produce monopolistic control of retail outlets"—the brand of control that facilitated the "serious social and political evils which were in large measure responsible for bringing on [P]rohibition." S.REP. No. 1215, 74th Cong., 1st Sess. 6–7 (1935).

BATF does not resist the assertion that, in passing the "tied house" and "commercial bribery" provisions, Congress' *ultimate* objective was to prevent wholesaler control of retailers. Rather, the Bureau focuses on occasional references in the legislative history to the need—in face of the unique threat of corruption in the newly-legal alcohol industry—to nip any tendency towards wholesaler control in its "incipiency"; BATF also trains attention on references to the need for "drastic enforcement" measures. H.R.REP. No. 1542, 74th Cong., 1st Sess. 6, 12 (1935). The Bureau

relies on these references to argue that Congress meant to arm BATF with authority to sanction any inducement that the Bureau genuinely believes is dangerous—capable, eventually, of breeding too cozy an association between wholesaler and retailer. Finally, BATF counters the suggestion that its reading of the legislative history turns the phrase "to the exclusion [of rival products]" into "mere surplusage." Brief for Petitioners at 12. The Bureau explains that the phrase means that the inducement in question must be *successful, i.e.,* it must in fact cause retailers to buy comparatively less from competitors—a minimal requirement, to be sure, but not a meaningless one.

While Congress no doubt anticipated agency vigilance, we cannot agree that the legislature meant to allow enforcement actions on the basis of the Bureau's unsubstantiated beliefs; if the Bureau suspects that a particular inducement places retailer independence at risk and thus that the inducement is proscribed by the FAAA, it must provide substantial support backing up its suspicion—at least where, as here, the anticompetitive nature of the inducement is nowhere apparent on its face. In this regard, our view accords with that of the Seventh Circuit in *Foremost:* "[A] mandate to address real threats in their incipiency is not an instruction to disregard the distinction between friend and foe; it is not a mandate to control weeds by scorching the earth." 860 F.2d at 239.

Indeed, the legislative history reveals that preventing wholesaler control (and other similarly undesirable effects) was not Congress' sole objective in passing the FAAA; Congress also intended that the Act would positively *promote* a competitive alcohol market. *See National Distributing,* 626 F.2d at 1008 (reviewing the relevant legislative history). The underlying

---

this fact that Congress' inclusion of the term in the FAAA reflected its conscious decision to add a distinct, substantial element to the violation of the "tied house" and "commercial bribery" provisions. We note but, in view of our analysis, do not rely on this argument.

**6.** At another point, the *National Distributing* court stated: "The primary purpose of the 'Ex-

clusive outlet,' 'Tied house,' and 'Commercial Bribery' subsections of section 5 seems to be prevention of a form of vertical integration whereby wholesalers or producers might gain effective control of ostensibly independent retail outlets." *Id.* at 1004.

**7.** *See supra* note 2.

premise is that a genuinely competitive market leads to low prices, and low prices remove any incentive for the creation of a corrupt black market—one of the prime evils of Prohibition. *See id.* ("[I]n both Houses of Congress there appeared to be total unanimity on the conclusion that lower [alcohol] prices were desirable."). Allowing the Bureau to sanction successful inducements that BATF merely believes have the potential to lead to wholesaler control, without having to make any factual showing supporting the Bureau's intuition, risks outlawing inducements that work to foster a competitive alcohol market.

Fedway's 1986 promotion seems to have been just this kind of inducement. Facing the Bureau's failure to make any findings to the contrary, we see no reason to resist viewing the promotion as a pro-competitive "quantity discount," albeit one paid in electronic goods instead of by direct price breaks. Simply by lowering the effective price of the promoted product, such discounts operate to make the rival product more expensive relative to the promoted product. Retailers who buy less of the rival product in this situation are making a free and rational economic choice to do so; that choice is not one BATF has been charged to inhibit.

Judicial precedent, while not heavily weighted in the *Chevron* inquiry into congressional intent, is consistent with our holding that BATF's construction of "exclusion" is not what the legislature meant. Specifically, the principal cases holding a wholesaler inducement unlawful under the "tied house" and "commercial bribery" provisions involved practices plainly threatening to retailer independence. *See Distilled Brands, Inc. v. Dunigan,* 222 F.2d 867 (2d Cir.1955) (wholesaler engaged in tying arrangements); *Black v. Magnolia Liquor*

*Co.,* 355 U.S. 24, 78 S.Ct. 106, 2 L.Ed.2d 5 (1957) (same); *Stein Distributing Co. v. Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms,* 779 F.2d 1407 (9th Cir.1986) (wholesaler's sales representatives physically moved competitors' products to less visible locations on retailers' shelves). *See also Foremost,* 860 F.2d at 238 ("These cases do not hold that every occurrence of a practice specified in the tied house and commercial bribery provisions, no matter how innocuous its motivation and how slight its effect, represents an inducement to a purchaser that will result in the 'exclusion' of a competing supplier's goods.").[8] Particularly revealing here is a passage from the BATF Director's own decision in the *Stein* case:

> Despite Stein's characterization of the facts, the concern under the FAA Act is not that displaying products in a particular manner affects sales or that poor selling wines were eliminated from retail stores. The concern is that these buying ... decisions were being made by the wholesaler, or by a retailer so strongly influenced by a wholesaler that *no independent decision is being made.* That this was the situation [here] ... is exemplified by the testimony of other wholesalers that they were directed by managers of retail chains ... to contact a Stein employee to get one of their products on the shelf at the store.

Order of the Director, Bureau of Alcohol, Tobacco and Firearms, No. 309 Western Region (Nov. 2, 1984), *reprinted in* Brief for Distilled Spirits Council *et al.,* Amici Curiae at A–32 (emphasis added).

In sum, under the first part of the *Chevron* analysis, we hold that Congress has plainly marked out what "exclusion" is *not;* it is not what occurs merely by virtue of a retailer purchasing less of a rival liquor

---

**8.** The only decision containing support for an opposing view is *Brown–Forman Distillers Corp. v. United States Treasury Dep't,* 591 F.2d 375 (6th Cir.1979). In *Brown–Forman,* the producer of Canadian Mist whiskey gave its distributor—which also handled rival Canadian whiskeys—prizes to award to sales representatives with the greatest sales of Canadian Mist during a certain two-month period. Noting that these incentives led the distributor to purchase less rival whiskey than it otherwise would have, the Sixth Circuit strongly suggested in dicta that this finding alone was sufficient to support a conclusion that the rival whiskey had been "exclu[ded]." *See id.* at 377. For the reasons indicated in this opinion, we disagree with that Sixth Circuit suggestion.

product. Because this is the only datum on which the Bureau relied in the present case, the Bureau erred in declaring Fedway's promotion unlawful. "Exclusion" requires that the Bureau show something more.

While we have demanded a factual showing that retailer independence is potentially threatened, we have not further specified what the "something more" is. Beyond the bare requirement we have identified, Congress' intent is no longer clear: neither the plain meaning nor the legislative history dictates precisely how strict a showing of threat is required. The second part of the *Chevron* analysis commands that in such circumstances courts leave further definition to the administering agency—so long as the definition reasonably construes the statutory provisions at issue.

We emphasize in this regard that our decision does not instruct BATF to limit sanctions to conduct verging on an antitrust violation. *But cf. Black,* 355 U.S. at 25, 78 S.Ct. at 108 ("One aim of Congress ... was to prohibit practices that were 'analogous to those prohibited by the antitrust laws.'") (citation to House Report omitted). We stress, too, by way of example, that the very promotion in this case might be cast in more ominous light under the FAAA if the VCRs and TVs were given directly to the retailers' employees without the retailers' knowledge. *Cf. American Distilling Co. v. Wisconsin Liquor Co.,* 104 F.2d 582 (7th Cir.1939) ("The vice of conduct labeled 'commercial bribery,' as related to unfair trade practices, is the advantage which one competitor secures over his fellow competitors by his *secret* and corrupt dealing with employees or agents of prospective purchasers.") (emphasis added).

We order here only that the agency take reasonable account of *both* policy interests underlying the "tied house" and "commercial bribery" provisions. The agency properly places substantial weight on the statute's recognition that the alcohol industry is unique. Both its historic association with corruption and the general belief that cheap and plentiful alcohol is not an unmitigated social good (as opposed, say, to cheap and plentiful home heating oil or shoes) suggest that the alcohol industry requires special oversight and regulation.[9] Yet definition of the "exclusion" criterion must *also* recognize adequately—as the agency's current definition does not—the value of pro-competitive wholesale promotions. This value derives not only from the traditional benefits of competition in terms of lower prices and improved quality, but also—as mentioned above—from the fact that a competitive alcohol market helps deter the formation of a corrupt black market.

Finally, in arriving at a reasonable interpretation of "exclusion" (and of the "tied house" and "commercial bribery" provisions more generally), the Bureau must take care to distinguish rationally between those promotions it decides are lawful and those it decides are not. The Director, thus far, has not taken such care. Specifically, at the same time that BATF sanctions Fedway's promotion, it allows quantity discounts paid in the form of alcohol products (similar or dissimilar to the purchased products). *See* ATF Rev.Rul. 83–3, 1983 ATF C.B. 34. What difference does it make that a retailer who buys ten cases of Finlandia vodka earns a color television rather than a case of wine? At oral argument, counsel for the Bureau suggested that, in the latter case, there is a greater likelihood that the discount will ultimately inure to the benefit of the consumer (i.e., work in a pro-competitive way). The suggestion, so far as we can tell, however, rests on speculation when what is needed is a fact-informed determination. On brief, the Bureau noted that even if the Fedway promotion operated like a traditional quantity discount, the promotion would still be unacceptable because Fedway had failed to register and

---

**9.** That some states require liquor, as distinct from all other consumer items, to be sold only in state-run stores illustrates this point. *See Liquor Store Debated,* N.Y. TIMES, Mar. 20, 1985, at C12. Significantly, however, states are beginning to move away from this practice. *See, e.g.,* Mike Glover, *Disposing of State Stores; Iowa Will Swear Off Retail Liquor Trade,* L.A. TIMES, Dec. 7, 1986, at 34.

invoice the TVs and VCRs properly. *See* Brief for Respondent at 7 n. 6, 38 n. 33. We doubt the Bureau's attachment to this distinction: Is BATF really suggesting that Fedway's promotion would have been lawful had it only been properly registered and invoiced?

For the above reasons, then, we would have ranked BATF's definition of "exclusion" in this case "unreasonable" under the second part of the *Chevron* analysis even had this court not come earlier to a confident conclusion regarding Congress' intent under the first part of the *Chevron* analysis.

### B. OTHER ISSUES ON APPEAL

■ Fedway, as petitioner for review, makes four other pleas, two of which we briefly address and find unpersuasive. First, Fedway argues that the "interstate commerce" requirement contained in the "tied house" and "commercial bribery" provisions was not satisfied in the present case. Both the ALJ and Director rejected this argument. We do not indulge in elaborate treatment of this Fedway plea. In view of the commodious construction accorded analogous statutory interstate commerce requirements,[10] we merely note two facts that suffice to satisfy the requirement: (1) Fedway's liquor, the putatively "exclu[ded]" rival liquor, and the electronic goods were manufactured out-of-state; and (2) much of the putatively "exclu[ded]" rival liquor was distributed by out-of-state wholesalers.

■ Second, Fedway contends that the provision of consumer electronic goods as occurred in Fedway's promotion does not constitute the giving away of "thing[s] of value" within the compass of section 205(b)(3) of the FAAA.[11] Fedway's only plausible argument here relies on language in *National Distributing* interpreting the statutory phrase to mean that the "thing"

itself "involve a *link* or *tie* between the between wholesaler or producer and the retailer." 626 F.2d at 1004. While we surely agree that unlawful inducements must "involve a *link* or *tie*," we have located that requirement within the definition of "exclusion." To place it elsewhere, we think, misses the plain meaning of the phrase "thing of value." Even if we were to find the phrase ambiguous, we would be bound, under the second part of the *Chevron* analysis, to defer to the Bureau's interpretation—an interpretation that is altogether reasonable.

Fedway's third plea is that the Director erred in reversing the ALJ's determination that Fedway's promotion putatively "exclu[ded]" rival liquor products from only three retailers. Specifically, Fedway contends that the Director applied an insufficiently respectful standard of review to the ALJ's fact findings. Because nothing in this case ultimately turns on the number of retailers involved, we decline to address the issue.

■ Fedway's fourth alternate plea is its most persuasive: that the record does not support the Director's finding that Fedway's putative violation was "willful[ ]" as required by the FAAA's permit-suspension provision. 27 U.S.C. § 204(e). Even if we had upheld the Director's judgment that Fedway's promotion violated the "tied house" and "commercial bribery" provisions, we would have found the record insufficient to support a "willful[ness]" ruling. Fedway, we recognize, knew before initiating its promotion that BATF would regard such a promotion with suspicion. Yet Fedway's decision to go ahead anyway rested on—at the very least—a reasonable belief that the statute allowed it. Not only did the emphasis on wholesaler control in both the *National Distributing* and *Stein* decisions strongly suggest the promotion's lawfulness;[12] in addition, prior to the Fed-

---

**10.** *See, e.g., Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 602 n. 11, 73 S.Ct. 872, 877 n. 11, 97 L.Ed. 1277 (1953) (stating that the Court has given the interstate commerce provision in the Sherman Act a "broad interpre-

tation[ ]" with a "wide sweep" and citing several cases).

**11.** *See supra* note 2.

**12.** As for the *Stein* case, we point again to the passage in the Director's own decision recogniz-

way promotion, the Bureau itself had supplied no plain statement of the meaning it attributed to the key word "exclusion." Indeed, in its implementing regulations under the "tied house" provision (promulgated in 1980), BATF refused to give "exclusion" a precise definition: "We believe the term 'exclusion' must be defined in light of the facts and circumstances of each case. Any definition would be imprecise." 45 Fed. Reg. at 63,244 (1980) (comments accompanying final rules). So far as the court can tell, not until the Bureau issued a 1989 industry circular—close to three years after the Fedway promotion—did BATF formally state its opinion that "exclusion" requires no findings beyond the success of the inducement (and even then, the Bureau was less than explicit). *See* ATF Indus. Circular 89–4, 2 Liquor Cont.L.Rep. (CCH) ¶ 41,249 (May 11, 1989).

### CONCLUSION

For the reasons stated, we grant Fedway's petition for review and vacate the Bureau's decision that Fedway's promotion was unlawful merely because it led retailers to buy less liquor from rival wholesalers.[13]

*It is so ordered.*

ing the significance of a strong showing of wholesaler control. *See supra* text accompanying note 8.

**13.** While this case indicates the utility of a rulemaking on the definitional question, we do not purport to instruct the agency further on the mode of clarification best suited to promotion of compliance with the "tied house" and "commercial bribery" provisions.