NATIONAL MINING ASSOCIATION,
et al., Appellees,

v.

U.S. ARMY CORPS OF ENGINEERS,
et al., Appellants.

Nos. 97–5099, 97–5112.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1998.

Decided June 19, 1998.

Ronald M. Spritzer, Attorney, U.S. Department of Justice, argued the cause for the federal appellants. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, David C. Shilton, Alice L. Mattice, Attorneys, and Steven Neugeboren, Counsel, U.S. Environmental Protection Agency.

Howard I. Fox argued the cause and filed the briefs for appellants National Wildlife Federation, et al.

Virginia S. Albrecht argued the cause for appellees National Mining Association, et al. With her on the brief were Gary J. Smith and Harold P. Quinn, Jr.

Lawrence R. Liebesman, Robin L. Rivett, M. Reed Hopper, Robert J. Saner, II, and Nancie G. Marzulla were on the brief for amici curiae City of Colorado Springs, Colorado, et al.

Tom Udall, Attorney General, State of New Mexico, Alletta Belin, Assistant Attorney General, Winston Bryant, Attorney General, State of Arkansas, J. Joseph Curran, Jr., Attorney General, State of Maryland, Jeremiah W. Nixon, Attorney General, State of Missouri, Joseph P. Mazurek, Attorney General, State of Montana, Frankie Sue Del Papa, Attorney General, State of Nevada, W.A. Drew Edmondson, Attorney General,

State of Oklahoma, William H. Sorrell, Attorney General, State of Vermont, and Christine O. Gregoire, Attorney General, State of Washington, were on the brief for amici curiae State of New Mexico, et al.

Before: SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge SILBERMAN.

STEPHEN F. WILLIAMS, Circuit Judge:

Section 404 of the Clean Water Act (the "Act") authorizes the United States Army Corps of Engineers (the "Corps") to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344. Section 301(a) of the Act provides that the "discharge of any pollutant by any person" is unlawful unless in compliance with Act's permit requirements, including those of § 404. *Id.* § 1311(a). "Discharge," in turn, is defined as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12).

In 1986 the Corps issued a regulation defining the term "discharge of dredged material," as used in § 404, to mean "any addition of dredged material into the waters of the United States," but expressly excluding "*de minimis*, incidental soil movement occurring during normal dredging operations." 51 Fed.Reg. 41,206, 41,232 (Nov. 13, 1986). In 1993, responding to litigation, the Corps issued a new rule removing the *de minimis* exception and expanding the definition of discharge to cover "any addition of dredged material into, *including any redeposit of dredged material within,* the waters of the United States." 33 CFR § 323.2(d)(1) (emphasis added). Redeposit occurs when material removed from the water is returned to it; when redeposit takes place in substantially the same spot as the initial removal, the

parties refer to it as "fallback." In effect the new rule subjects to federal regulation virtually all excavation and dredging performed in wetlands.

The plaintiffs, various trade associations whose members engage in dredging and excavation, mounted a facial challenge to the 1993 regulation, claiming that it exceeded the scope of the Corps's regulatory authority under the Act by regulating fallback. The district court agreed and granted summary judgment for the plaintiffs. *American Mining Congress v. United States Army Corps of Engineers,* 951 F.Supp. 267 (D.D.C.1997). The district court also entered an injunction prohibiting the Corps and the Environmental Protection Agency, who jointly administer § 404, from enforcing the regulation anywhere in the United States. *Id.* at 278. We affirm.

\* \* \*

The Act sets up two independent permitting systems. See 33 U.S.C. § 1311(a). Section 402 authorizes EPA (or state agencies in some circumstances) to issue National Pollutant Discharge Elimination System ("NPDES") permits to control the discharge of wastewater into navigable waters. Section 404, the provision at issue in this case, authorizes the Corps, with EPA oversight, to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a).[1] At the time of the Act's passage in 1972, the Corps already had jurisdiction over navigational dredging under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

For the purposes of the Act, the phrase "navigable waters" has been construed to include wetlands. *United States v. Riverside Bayview Homes,* 474 U.S. 121, 131–32 & n. 8, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (upholding as not unreasonable an interpretation by the Corps that the Act is applicable to wetlands "adjacent to but not regularly flooded by rivers, streams, and other hydrographic features more conventionally identifiable as 'waters' ").[2] Wetlands, in turn, are defined

---

1. The challenged regulation does not address discharge of "fill material," which the Corps defines as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] waterbody." 33 CFR § 323.2(e).

2. Compare *United States v. Wilson,* 133 F.3d 251, 257 (4th Cir.1997) (holding that regulations pur-

by the Corps as areas "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 CFR § 328.3(b). The United States Fish and Wildlife Service estimated that as of the 1980s there were 104 million acres of wetlands in the contiguous United States—about five percent of the total land surface of the lower 48 states. T.E. Dahl, *Wetlands Losses in the United States 1780's to 1980's* 5 (U.S. Fish & Wildlife Service 1990). (Because so much of Alaska is wetlands by the prevailing definition, the proportion rises to twelve percent if all 50 states are included.) *Id.* The plaintiffs assert that seventy-five percent of wetlands in the United States are privately owned. Plaintiffs' Br. at 6.

In 1977 the Corps promulgated regulations that generally tracked the statutory language, defining "discharge of dredged material" as "any addition of dredged material into the waters of the United States," with a few limited exceptions. 42 Fed.Reg. 37,145 (July 19, 1977). A new regulation issued in 1986 exempted from the permit requirement "*de minimis,* incidental soil movement occurring during normal dredging operations." 51 Fed.Reg. at 41,232. Although this regulation did not define "normal dredging operations," its preamble gave some guidance as to the exemption's coverage:

> Section 404 clearly directs the Corps to regulate the *discharge* of dredged material, not the dredging itself. Dredging operations cannot be performed without some fallback. However, if we were to define this fallback as a "discharge of dredged material," we would, in effect, be adding the regulation of dredging to section 404 which we do not believe was the intent of Congress.

*Id.* at 41,210. The parties agree that the 1986 rule did, however, regulate "sidecasting," which involves placing removed soil in a

wetland but at some distance from the point of removal (e.g., by the side of an excavated ditch). See 58 Fed.Reg. 45,008, 45,013/3 (Aug. 25, 1993) (noting that sidecasting has "always been regulated under Section 404.").

The 1993 rulemaking under challenge here was prompted by a lawsuit, *North Carolina Wildlife Federation v. Tulloch,* Civ. No. C90–713–CIV–5–BO (E.D. N.C.1992), concerning a developer who sought to drain and clear 700 acres of wetlands in North Carolina. See 58 Fed.Reg. at 45,016. Because the developer's efforts involved only minimal incidental releases of soil and other dredged material, the Corps's field office personnel determined that, under the terms of the 1986 regulation, § 404's permit requirements did not apply. Environmental groups, concerned by what they viewed as the adverse effects of the developer's activities on the wetland, filed an action seeking enforcement of the § 404 permit requirement. As part of the settlement of the *Tulloch* case (a settlement to which the developer was not a party), the two administering agencies agreed to propose stiffer rules governing the permit requirements for landclearing and excavation activities. The result—the regulation at issue here—has come to be called the "*Tulloch* Rule."

As mentioned above, the *Tulloch* Rule alters the preexisting regulatory framework primarily by removing the *de minimis* exception and by adding coverage of incidental fallback. Specifically, the rule defines "discharge of dredged material" to include "[a]ny addition, *including any redeposit,* of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." 33 CFR § 323.2(d)(1)(iii) (emphasis added).[3]

The *Tulloch* Rule does have its own *de minimis* exception, but it is framed in terms of the Act's overall goals. A permit is not

---

porting to reach wetlands whose degradation or destruction "could affect" interstate or foreign commerce were beyond statutory authorization because they would "include intrastate waters that need have nothing to do with navigable or interstate waters.").

3. EPA promulgated a parallel rule, which is codified at 40 CFR § 232.2(1)(iii).

required for "any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the United States." 33 CFR § 323.2(d)(3)(i). Persons engaging in "mechanized landclearing, ditching, channelization and other excavation activity," however, bear the burden of proving to the Corps that their activities would not have destructive or degrading effects. *Id.* Degradation is defined as any effect on the waters of the United States that is more than *de minimis* or inconsequential. *Id.* § 323.2(d)(5). Thus, whereas the 1986 rule exempted *de minimis* soil movement, the *Tulloch* Rule covers all discharges, however minuscule, unless the Corps is convinced that the *activities with which they are associated* have only minimal adverse effects. In promulgating the new rule the Corps "emphasize[d] that the threshold of adverse effects for the *de minimis* exception is a very low one." 56 Fed.Reg. at 45,020.

It is undisputed that by requiring a permit for "*any* redeposit," 33 CFR § 323.2(d)(1)(iii) (emphasis added), the *Tulloch* Rule covers incidental fallback. According to the agencies, incidental fallback occurs, for example, during dredging, "when a bucket used to excavate material from the bottom of a river, stream, or wetland is raised and soils or sediments fall from the bucket back into the water." Agencies' Br. at 13. (There is no indication that the rule would not also reach soils or sediments falling out of the bucket even *before* it emerged from the water.) Fallback and other redeposits also occur during mechanized landclearing, when bulldozers and loaders scrape or displace wetland soil, see 58 Fed.Reg. 45,017–18, as well as during ditching and channelization, when draglines or backhoes are dragged through soils and sediments. See *id.* at 45,018. Indeed, fallback is a practically inescapable byproduct of all these activities. In the preamble to the *Tulloch* Rule the Corps noted that "it is virtually impossible to conduct mechanized landclearing, ditching, channelization or excavation in waters of the United States without causing incidental redeposition of dredged material (however small or temporary) in the process." *Id.* at 45,017. As a result, the *Tulloch* Rule effectively requires a permit for all those activities, subject to a limited exception for ones that the Corps in its discretion deems to produce no adverse effects on waters of the United States.

\* \* \*

The plaintiffs claim that the *Tulloch* Rule exceeds the Corps's statutory jurisdiction under § 404, which, as we have noted, extends only to "discharge," defined as the "addition of any pollutant to navigable waters." 33 U.S.C. §§ 1344, 1362(12). It argues that fallback, which returns dredged material virtually to the spot from which it came, cannot be said to constitute an *addition* of anything. Therefore, the plaintiffs contend, the *Tulloch* Rule conflicts with the statute's unambiguous terms and cannot survive even the deferential scrutiny called for by *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The "jurisdictional" character of the issue has no effect on the level of deference, *Oklahoma Natural Gas Co. v. FERC,* 28 F.3d 1281, 1283–84 (D.C.Cir. 1994), as the plaintiffs seem to acknowledge by their silence on the subject.

The agencies argue that the terms of the Act in fact demonstrate that fallback may be classified as a discharge. The Act defines a discharge as the addition of any pollutant to navigable waters, 33 U.S.C. § 1362(12), and defines "pollutant" to include "dredged spoil," as well as "rock," "sand," and "cellar dirt." *Id.* § 1362(6). The Corps in turn defines "dredged material" as "material that is excavated or dredged from waters of the United States," 33 CFR § 323.2(c), a definition that is not challenged here. Thus, according to the agencies, wetland soil, sediment, debris or other material in the waters of the United States undergoes a legal metamorphosis during the dredging process, becoming a "pollutant" for purposes of the Act. If a portion of the material being dredged then falls back into the water, there has been an addition of a pollutant to the waters of the United States. Indeed, according to appellants National Wildlife Federation *et al.* ("NWF"), who intervened as defendants below, this reasoning demonstrates that regulation of redeposit is actually *required* by the Act.

■ We agree with the plaintiffs, and with the district court, that the straightforward statutory term "addition" cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back. Because incidental fallback represents a net withdrawal, not an addition, of material, it cannot be a discharge. As we concluded recently in a related context, "the nearest evidence we have of definitional intent by Congress reflects, as might be expected, that the word 'discharge' contemplates the addition, not the withdrawal, of a substance or substances." *North Carolina v. FERC*, 112 F.3d 1175, 1187 (D.C.Cir.1997). The agencies' primary counterargument—that fallback constitutes an "addition of any pollutant" because material becomes a pollutant only upon being dredged—is ingenious but unconvincing. Regardless of any legal metamorphosis that may occur at the moment of dredging, we fail to see how there can be an addition of *dredged material* when there is no addition of *material*. Although the Act includes "dredged spoil" in its list of pollutants, 33 U.S.C. § 1362(6), Congress could not have contemplated that the attempted removal of 100 tons of that substance could constitute an addition simply because only 99 tons of it were actually taken away.[4]

In fact the removal of material from the waters of the United States, as opposed to the discharge of material into those waters, is governed by a completely independent statutory scheme. Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, makes it illegal "to excavate or fill" in the navigable waters of the United States without the Corps's approval. As the general counsel of the Army noted in a law review

article published a few years after the passage of the Clean Water Act, Congress enacted "two separate statutory frameworks. Section 10 of the 1899 Act covers the act of dredging, while Section 404 [of the Clean Water Act] covers the disposal of the dredged material." Charles D. Ablard and Brian B. O'Neill, *Wetland Protection and Section 404 of the Federal Water Pollution Control Act Amendments of 1972: A Corps of Engineers Renaissance*, 1 Vt. L.Rev. 51, 93 (1976).

The agencies, though acknowledging that the *Tulloch* Rule effectively requires a permit for all mechanized landclearing, ditching, channelization or excavation in waters of the United States, see 58 Fed.Reg. at 45,017, locate their permitting requirement under § 404, not under the Rivers and Harbors Act's explicit coverage of "excavat[ion]." The explanation for this choice is apparently that the scope of the Corps's geographic jurisdiction is narrower under the Rivers and Harbors Act than under the Clean Water Act, extending only to waters subject to the ebb and flow of the tide, or waters that are used, have been used, or may be susceptible for use to transport interstate or foreign commerce. 33 CFR § 329.4; see also *id.* § 328.1 (noting difference between geographic jurisdiction under the two statutes).

There may be an incongruity in Congress's assignment of extraction activities to a statute (the Rivers and Harbors Act) with a narrower jurisdictional sweep than that of the statute covering discharges (the Clean Water Act). This incongruity, of course, could be cured either by narrowing the jurisdictional reach of the Clean Water Act or broadening that of the Rivers and Harbors Act.[5] But we do not think the agencies can

---

4. The unreasonableness of the agencies' statutory interpretation was illustrated by some of the hypotheticals posed at oral argument. For instance, counsel for the agencies admitted that under their interpretation of the term "discharge" in § 301(a), it "might very well" be permissible to require any landowner in the United States wishing to cut down a tree in a wetland to obtain a § 402 permit, since 33 U.S.C. § 1362(6) defines "pollutant" to include "biological material." Oral Arg. Tr. at 22. Similarly, counsel agreed that the Corps could require a permit to ride a bicycle across a wetland under

its interpretation of § 404, although bicycle-riding seems—for now—to be exempted under the *Tulloch* Rule as an activity that does not generally destroy or degrade waters of the United States. Oral Arg. Tr. at 25; see 58 Fed.Reg. at 45,023 (indicating that "walking, grazing, vehicular traffic, and boating" would not generally be regulated).

5. Of course it is conceivable that even if the statutes were construed to cover the same geographic jurisdiction, some activities—perhaps some kinds of mechanized landclearing—might

do it simply by declaring that incomplete removal constitutes addition.

The agencies also point to some specific exemptions set forth in § 404(f) of the Act in support of their view that fallback can reasonably be said to constitute discharge. Congress added the subsection in 1977, apparently in response to the broad construction of "discharge" in the 1977 regulations. It provides that "the discharge of dredged or fill material ... is not prohibited ... or otherwise subject to regulation" under the Act's permitting requirements when the discharge results from any of a number of specifically exempted activities, including "normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, [or] minor drainage," 33 U.S.C. § 1344(f)(1)(A), and "maintenance of drainage ditches," *id.* § 1344(f)(1)(C). After listing these exemptions, § 404(f) provides that a permit shall nonetheless be required for any activity "having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced." *Id.* § 1344(f)(2).

The agencies claim these exemptions show that as a general matter Congress considered fallback to be covered by § 404. They especially note that § 404(f)(1) uses the term "*discharge* of dredged or fill material" to describe the consequences of the protected activities, supposedly reflecting a congressional belief that fallback is a form of discharge.

We find the exemptions far less telling. Some of the named activities—plowing, ditch maintenance, and the like—may produce fallback, but they may also produce actual discharges, i.e., additions of pollutants, so that § 404(f) accomplishes a useful purpose simply by exempting them insofar as they produce the latter. Some others, such as seeding, seem to us just as unlikely to produce fallback as actual discharge, so we are reluctant to draw any inference other than that

Congress emphatically did not want the law to impede these bucolic pursuits.

NWF complains that our understanding of "addition" reads the regulation of dredged material out of the statute. They correctly note that since dredged material comes from the waters of the United States, 33 CFR § 323.2(c), any discharge of such material into those waters could technically be described as a "redeposit," at least on a broad construction of that term. The Fifth Circuit made a similar observation fifteen years ago: " '[D]redged' material is by definition material that comes from the water itself. A requirement that all pollutants must come from outside sources would effectively remove the dredge-and-fill provision from the statute." *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 924 n. 43 (5th Cir.1983). But we do not hold that the Corps may not legally regulate some forms of redeposit under its § 404 permitting authority.[6] We hold only that by asserting jurisdiction over "*any* redeposit," including incidental fallback, the *Tulloch* Rule outruns the Corps's statutory authority. Since the Act sets out no bright line between incidental fallback on the one hand and regulable redeposits on the other, a reasoned attempt by the agencies to draw such a line would merit considerable deference. Cf. *Dubois v. U.S. Dep't of Agriculture,* 102 F.3d 1273, 1296–99 (1st Cir.1996) (although movement of pollutants within the same body of water might not constitute an "addition" for purposes of NPDES permit requirement, movement from one body of water to a separate one with different water quality is an addition). But the *Tulloch* Rule makes no effort to draw such a line, and indeed its overriding purpose appears to be to expand the Corps's permitting authority to encompass incidental fallback and, as a result, a wide range of activities that cannot remotely be said to "add" anything to the waters of the United States.

The agencies cite opinions from several other circuits in support of the proposition that redeposit may be regulated under § 404.

still lie beyond the reach of both. Any such lacuna—as the agencies would clearly perceive it—would of course be simply a function of Congress's decisions.

6. Even the plaintiffs concede that under a broad reading of the term "redeposit," "a redeposit could be an addition to [a] new location and thus a discharge." Plaintiffs' Br. at 17.

Because all of these decisions predated the *Tulloch* Rule, however, none addressed the fallback issue directly. Indeed, none of them contains any language suggesting that regulation of fallback would be proper.

In *Avoyelles,* for example, the Fifth Circuit held that the § 404 permit requirement applied to a large-scale mechanized landclearing project in Louisiana. Although the court held that "[t]he word 'addition,' as used in the definition of the term 'discharge,' may reasonably be understood to include 'redeposit,'" 715 F.2d at 923, it did not consider incidental fallback at all. Rather, it simply held that the deliberate leveling of sloughs that had formerly contained rainwater, for the purpose of replacing an "aquatic area" with dry land, constituted a discharge of *fill* material. *Id.* at 924–25. (It did not even reach the question whether the activities were "a discharge of dredged material." *Id.* at 925.) Similarly, the Eleventh Circuit did not reach the fallback issue in its decision in *United States v. M.C.C. of Florida,* 772 F.2d 1501 (11th Cir.1985), *vacated on other grounds,* 481 U.S. 1034, 107 S.Ct. 1968, 95 L.Ed.2d 809 (1987), *readopted in relevant part on remand,* 848 F.2d 1133 (11th Cir. 1988), finding instead that a construction company had displaced dredged spoil from the bottom of a waterway "onto the adjacent sea grass beds," 772 F.2d at 1506, a displacement that seems analytically more similar to sidecasting than to fallback.[7]

Perhaps the strongest authority for the agencies' position is *Rybachek v. EPA,* 904 F.2d 1276 (9th Cir.1990). There the Ninth Circuit found that the Act permitted EPA to regulate placer mining, a process in which miners excavate dirt and gravel in and around waterways, and, after extracting the

gold, discharge the leftover material back into the water. *Rybachek* held that the material separated from gold and released into the stream constituted a pollutant, and, to the extent that "the material discharged originally comes from the streambed itself, [its] resuspension [in the stream] may be interpreted to be an addition of a pollutant under the Act." *Id.* at 1285. *Rybachek* would help the agencies if the court had held that imperfect extraction, i.e.; extraction accompanied by incidental fallback of dirt and gravel, constituted "addition of a pollutant," but instead it identified the regulable discharge as the discrete act of dumping leftover material into the stream after it had been processed. Finally, *Minnehaha Creek Watershed District v. Hoffman,* 597 F.2d 617 (8th Cir.1979), held simply that the construction of dams and riprap fall within § 404 because they involve "the placement of rock, sand or cellar dirt into the body of water." *Id.* at 626.[8]

The agencies make one last-ditch argument in defense of the *Tulloch* Rule, relying on the fact that the plaintiffs have raised a facial challenge to its validity. In effect, the agencies argue that the deferential *Chevron* test should be replaced in the context of facial attacks by an even more lenient standard—an administrative-law version of the test used by the Supreme Court to evaluate a facial constitutional challenge to a statute in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). *Salerno* said that a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. 2095.[9] So here, argues

---

**7.** As for sidecasting, we note that after the briefs were submitted in this case a divided panel of the Fourth Circuit issued opinions concerning whether that activity may properly be regulated under the Act. Judge Niemeyer held that sidecasting does not constitute an "addition" within the meaning of the Act, Judge Payne held that it does, and Judge Luttig joined neither opinion. See *Wilson,* 133 F.3d at 258–60 (opinion of Niemeyer, J.); *id.* at 272–75 (opinion of Payne, J.).

**8.** In addition, our decision today is wholly consistent with *National Wildlife Federation v. Gor-*

*such,* 693 F.2d 156 (D.C.Cir.1982), in which we held that EPA's interpretation of the term "addition" "must be accepted unless manifestly unreasonable." *Id.* at 175. For the foregoing reasons we find the agencies' reading of "addition" as including incidental fallback to be just that.

**9.** The *Salerno* test does not apply in the area of First Amendment free speech rights, where statutes with some valid applications may nonetheless be struck down for overbreadth. See *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095.

the Corps, the *Tulloch* Rule must be upheld if any set of circumstances exists under which the rule would be within the Corps's statutory authority.

If the *Salerno* approach applies here at all, it does so with a wrinkle. The plaintiffs raise a facial challenge to a 1993 rulemaking which broadened the scope of the preexisting 1986 regulation, but they do not deny that the earlier rule had valid applications. Thus, as even the Corps concedes, the plaintiffs' burden under a *Salerno* approach would be to show that the *incremental* regulation represented by the *Tulloch* Rule is invalid under every set of circumstances; to show, in other words, that the Corps would be acting *ultra vires* every time it required a permit under the 1993 rule that it could not have required under the 1986 rule.

Once this wrinkle has been added, we are not at all sure that the plaintiffs fail to carry the *Salerno* burden. At oral argument, counsel for the agencies gave three examples of discharges to which he said the *Tulloch* Rule could be validly applied but that the old rule did not cover: (1) mechanized landclearing, (2) fallback at various distances from the point of removal, and (3) resuspension of dredged material in a body of water. Oral Arg. Tr. at 29–30, 47–48, 102. Most discharges in these three categories, however, would appear to have been regulable by the Corps before the enactment of the *Tulloch* Rule. Subjection of mechanized landclearing to § 404 permit requirements was upheld pre-*Tulloch*, in *Avoyelles*. As for redeposits at some distance from the point of removal, the agencies' assertion that sidecasting has "always been regulated under Section 404," 58 Fed.Reg. at 45,013, places such conduct within the pre-*Tulloch* core. But see *United States v. Wilson*, 133 F.3d 251, 258–60 (Niemeyer, J.) (4th Cir.1997) (summarized in note 7 above). Finally, if by "resuspension" counsel for the agencies was referring to activities like the one at issue in *Rybachek* (removal of dirt and gravel from a streambed and its subsequent redeposit in the waterway after segregation of gold), the pre-*Tulloch* rule clearly suffices. And if counsel meant "resuspension" to cover excavation or dredging accompanied by incidental fallback (in

other words, as the agencies concede, virtually every act of excavation or dredging), it contradicts the statutory requirement of an addition.

This leaves at most some marginal cases that might fall outside the scope of pre-*Tulloch* regulation but would still qualify as additions under the Act. Such cases might include incidental soil movements occurring in normal dredging operations that nonetheless somehow result in a transfer "between unrelated water bodies of different water quality." *Dubois,* 102 F.3d at 1297–98. We express no opinion as to how the *Dubois* concept of an addition might apply, if at all, to the sort of "waters" primarily at issue here, that is, wetlands.

■ Yet we need not determine precisely how far the *Tulloch* Rule goes beyond the preexisting regulations, for we hold that the *Salerno* standard does not apply here. The Supreme Court has never adopted a "no set of circumstances" test to assess the validity of a regulation challenged as facially incompatible with governing statutory law. Indeed, the Court in at least one case, *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), upheld a facial challenge under normal *Chevron* standards, despite the existence of clearly valid applications of the regulation. The statute required the Department of Health and Human Services to cover all children who suffered from disabilities of "comparable severity" to those that would disable an adult, *id.* at 529, 110 S.Ct. 885, but HHS's rule excluded some who would have been considered disabled had they been adults. Although some of the exclusions were clearly perfectly proper under the statute, the Court invalidated the rule, saying that "a facial challenge [was] a proper response to the systemic disparity between the statutory standard and [HHS's] approach to child-disability claims." *Id.* at 537 n. 18, 110 S.Ct. 885.

Our own cases confirm that the normal *Chevron* test is not transformed into an even more lenient "no valid applications" test just because the attack is facial. We have on several occasions invalidated agency regulations challenged as facially inconsistent with governing statutes despite the presence of

easily imaginable valid applications. See, e.g., *Health Ins. Ass'n of America, Inc. v. Shalala*, 23 F.3d 412, 418–20 (D.C.Cir.1994) (holding that agency exceeded statutory authority in enacting regulation concerning Medicare payment recovery, because rule plainly covered some situations in which recovery was barred by statute).

To be sure, the Supreme Court has recently suggested that it may take a more *Salerno*-like line on facial challenges to regulations. In *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), the Court upheld a regulation promulgated by the Secretary of the Interior interpreting the word "harm" in the Endangered Species Act. The Court noted that because the parties attacking the regulation were proceeding on a facial basis, "they ask us to invalidate the Secretary's understanding of 'harm' in every circumstance," *id.* at 699, 115 S.Ct. 2407, which the Court declined to do. There is no indication, however, that this observation in any way contributed to the result in that case. The Court did not sustain the regulation on the basis of a few hypothetical instances of valid application; instead, it held that the Secretary's understanding of "harm" was a reasonable interpretation of the statute in general. See *id.* at 696–708, 115 S.Ct. 2407. As Justice Scalia noted in dissent, it would have been remarkable for the Court to find that the regulation omitted an element made essential by the statute, and then proceed to uphold the regulation against facial attack because that element might happen to be present on the facts of a particular case. See *id.* at 731–32, 115 S.Ct. 2407 (Scalia, J., dissenting). The same can be said here: by purporting to cover "*any* redeposit," the *Tulloch* Rule eschews the Act's "addition" requirement. A facial attack on the rule should not fail simply because the Corps might apply it to cases where an addition is present.

Although we reject the agencies' proposed extension of *Salerno*, we emphasize that it is quite distinct from the familiar proposition that a court should reject a facial challenge, either as unripe or meritless, when the challenger's success turns on the assumption that

the agency will exercise its discretion unlawfully, see, e.g., *Action Alliance Of Senior Citizens Of Greater Philadelphia v. Heckler*, 789 F.2d 931, 941 (D.C.Cir.1986), or will misapply the regulation, see, e.g., *Union of Concerned Scientists v. U.S. Nuclear Regulatory Commission*, 880 F.2d 552, 558–59 (D.C.Cir. 1989). Cf. *Sullivan v. Everhart*, 494 U.S. 83, 94, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990) (although petitioners argued that Secretary of HHS might apply statute in bad faith, "since that is an obvious violation of the Act it is ... not the stuff of which a facial challenge can be constructed."). The plaintiffs here rely on no such assumption. The problem with the *Tulloch* Rule is that its *faithful* application would carry the agency beyond its statutory mandate.

There remains only the question of remedy. The agencies challenge the district court's issuance of a nationwide injunction ordering "that the so-called *Tulloch* rule is declared invalid and set aside, and henceforth is not to be applied or enforced by the Corps of Engineers or the Environmental Protection Agency." 951 F.Supp. at 278. The agencies make two arguments: first, that the plaintiffs are not entitled to an injunction because they presented no record evidence, and the district court made no explicit findings, as to the elements necessary for injunctive relief; and second, that even if the plaintiffs were entitled to an injunction the district court erred by granting nationwide relief to plaintiffs and non-parties alike.

As for the first argument, we note at the outset that district courts enjoy broad discretion in awarding injunctive relief. See, e.g., *Wagner v. Taylor*, 836 F.2d 566, 575 (D.C.Cir.1987). The district court was well within its discretion in finding that the complaint placed the agencies on notice that appellees sought both declaratory and injunctive relief. See First Amended Complaint For Declaratory and Injunctive Relief (filed Sept. 20, 1993), at 25–26. Although the court made no express findings as to the elements necessary for a permanent injunction (the most salient of which is the inadequacy of legal remedies), we do not think it was required to do so. Even now the agencies identify no legal remedy as adequate. Mon-

ey damages were never sought in this action, and even if the government were somehow found to have waived its sovereign immunity against damage actions, it is hard to see the relevance of such remedies in the context of a pre-enforcement challenge to agency regulations. The plaintiffs did seek (and obtain) a declaration of the *Tulloch* Rule's invalidity, but this brand of relief is itself more equitable than legal in nature. See *In re United States Brass Corp.*, 110 F.3d 1261, 1267 (7th Cir.1997); *Penthouse International, Ltd. v. Meese*, 939 F.2d 1011, 1019–20 (D.C.Cir. 1991). Moreover, in their summary judgment motion the agencies failed to argue that a declaratory judgment would be adequate, or to contest any of the elements necessary for an injunction. And once the court reached the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there was no separate need to show irreparable injury, as that is merely one possible "basis for showing the inadequacy of the legal remedy." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2944, at 94 (2d ed.1995). In sum we do not think the district court was required to make explicit findings as to these elements before issuing its injunction.

■ The agencies' argument about the breadth of the injunction fares no better. We have made clear that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C.Cir.1989). Justice Blackmun made a similar observation in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), writing in dissent but apparently expressing the view of all nine Justices on this question:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court. On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

*Id.* at 913, 110 S.Ct. 3177 (Blackmun, J., dissenting) (citation omitted). See also *id.* at 890 n. 2, 110 S.Ct. 3177 (majority opinion) (noting that under APA, successful challenge by aggrieved individual can affect entire agency program). The agencies cite *Baeder v. Heckler*, 768 F.2d 547 (3d Cir.1985), for the proposition that a court in some circumstances may not order a nationwide injunction even after holding a regulation invalid. *Baeder*, however, did not involve a facial challenge to the validity of a regulation; the Third Circuit held simply that a sweeping injunction would not be a proper remedy "in the context of [an individual plaintiff's] claim for disability benefits." *Id.* at 553.

Moreover, if persons adversely affected by an agency rule can seek review in the district court for the District of Columbia, as they often may, see 28 U.S.C. § 1391(e), our refusal to sustain a broad injunction is likely merely to generate a flood of duplicative litigation. Even though our jurisdiction is not *exclusive,* an injunction issued here only as to the plaintiff organizations and their members would cause all others affected by the *Tulloch* Rule (or at least all those with enough at stake and with astute enough lawyers) to file separate actions for declaratory relief in this circuit. Issuance of a broad injunction obviates such repetitious filings. It does so, to be sure, at the cost of somewhat diminishing the scope of the "non-acquiescence" doctrine, under which the government may normally relitigate issues in multiple circuits. See *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). By contrast, agency defeats in other circuits cannot produce as severe an effect, because, although other courts can also issue nationwide injunctions, they need not fear a flood of relitigation since venue

restrictions would exclude many would-be plaintiffs from access to the invalidating court. The resulting gap in the effective scope of the non-acquiescence doctrine appears to be no more than an inevitable consequence of the venue rules in combination with the APA's command that rules "found to be ... in excess of statutory jurisdiction" shall be not only "h[e]ld unlawful" but "set aside." 5 U.S.C. § 706(2)(C).

\* \* \*

In a press release accompanying the adoption of the *Tulloch* Rule, the White House announced: "Congress should amend the Clean Water Act to make it consistent with the agencies' rulemaking." White House Office on Environmental Policy, *Protecting America's Wetlands: A Fair, Flexible, and Effective Approach* 23 (Aug. 24, 1993). While remarkable in its candor, the announcement contained a kernel of truth. If the agencies and NWF believe that the Clean Water Act inadequately protects wetlands and other natural resources by insisting upon the presence of an "addition" to trigger permit requirements, the appropriate body to turn to is Congress. Without such an amendment, the Act simply will not accommodate the *Tulloch* Rule. The judgment of the district court is

*Affirmed.*

SILBERMAN, Circuit Judge, concurring:

I join the opinion of the court and write separately only to make explicit what I think implicit in our opinion. We hold that the Corps's interpretation of the phrase "*addition* of any pollutant to navigable waters" to cover incidental fallback is "unreasonable," which is the formulation we use when we have first determined under *Chevron* that neither the statutory language nor legislative history reveals a precise intent with respect to the issue presented—in other words, we are at the second step of the now-familiar *Chevron* Step I and Step II analysis. *See, e.g., Whitecliff, Inc. v. Shalala,* 20 F.3d 488 (D.C.Cir.1994); *Fedway Associates, Inc. v. United States Treasury,* 976 F.2d 1416 (D.C.Cir.1992); *Abbott Labs. v. Young,* 920 F.2d 984 (D.C.Cir.1990); *Associated Gas Distribs. v. FERC,* 899 F.2d 1250 (D.C.Cir.

1990). As our opinion's discussion of prior cases indicates, the word addition carries both a temporal and geographic ambiguity. If the material that would otherwise fall back were moved some distance away and then dropped, it very well might constitute an "addition." Or if it were held for some time and then dropped back in the same spot, it might also constitute an "addition." But the structure of the relevant statutes indicates that it is unreasonable to call incidental fallback an addition. To do so perforce converts *all* dredging—which is regulated under the Rivers and Harbors Act—into discharge of dredged material which is regulated under the Clean Water Act.

Moreover, that Congress had in mind either a temporal or geographic separation between excavation and disposal is suggested by its requirement that dredged material be discharged at "specified disposal sites," 33 U.S.C. § 1344 (1994), a term which simply does not fit incidental fallback.

The Corps attempts to avoid these difficulties by asserting that rock and sand are magically transformed into pollutants once dredged, so *all* dredging necessarily results in an addition of pollutants to navigable waters. But rock and sand only become pollutants, according to the statute, once they are "discharged into water." 33 U.S.C. § 1362(6) (1994). The Corps's approach thus just leads right back to the definition of discharge.