UNITED STATES of America, Plaintiff,

v.

**HALLMARK CONSTRUCTION COMPANY, Defendant.**

No. 97 C 3682.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 8, 1998.

Christopher Eric Tracy, Jonathan C. Haile, United States Attorney's Office, Chicago, IL, for Plaintiff.

Johnine J. Brown, Sheila H. Deely, The Brown Environmental Law Group, P.C., Chciago, IL, for Defendant.

### DECISION ON THE MERITS

CONLON, District Judge.

Upon referral from the United States Army Corps of Engineers, Chicago District ("the Corps"), the United States filed a complaint against Hallmark Construction Company ("Hallmark") for allegedly discharging pollutants into an isolated wetland on property known as the Heritage Knolls Subdivision. The United States seeks injunctive relief from Hallmark for unauthorized discharge of dredge or fill material into the wetland.

A three-day bench trial was held. After considering the testimony, exhibits and arguments of counsel, the court enters the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. As a preliminary matter, the court adopts and incorporates the parties' stipulation of uncontested facts, as well as uncontroverted portions of Hallmark's statement of contested facts in the joint final pretrial order.

## I. THE WETLAND DELINEATION OF AREA B

The following background facts are either undisputed or have been proven at trial. In 1988, Hallmark purchased the property then known as the Swift Research Farm in order to develop a residential subdivision, Heritage Knolls. The farm contained several natural topographical depressions. The parties dispute the wetland jurisdictional status of the roughly five-acre depression known as Area B. Area B was an isolated water or wetland with no surface connection to navigable waters.

The farm was continuously planted from 1969 to 1988. Before development, all parts of Area B were cultivated for farming. Area B was drained by buried clay field tile to allow farming. The main tile lines were twelve-inch tile, connected to smaller tile lines three-inch and six-inch in diameter. The field tile was regularly and continuously kept in repair when the property was farmed. Eight out of ten years the tenant farmer, John Kestel, successfully grew crops in Area B.

In 1989, Hallmark began excavating Area B to construct a retention pond and stormwater management complex. Hallmark also used clean dirt for filling and grading other parts of Area B to construct roads and upland lots on which houses could be built. In the summer of 1990, Hallmark's civil engineer, Rogina & Associates ("Rogina"), advised that a wetland delineation should be done and hired Planning Resources, Inc. ("PRI"). PRI's engineer Kenneth Klick visited the property to identify and delineate wetlands on July 11, 1990.

During Klick's July 11 visit to the property, he observed flotsam and hydrophytic vegetation in Area B. A flotsam ring is created by dead or drowned vegetable debris deposited in a circular pattern where temporary inundation has occurred and receded. Klick reported the area previously had been affected by farming practices and approximately one acre of Area B had been graded to prepare for the construction or installation of roads and utilities. Although other areas of the farm had standing water during the inspection, Area B was neither saturated nor inundated. Using the methodology of the 1989 Federal Manual for Identifying and Delineating Jurisdictional Wetlands ("1989 Manual"),[1] Klick concluded Area B was a "seasonally flooded farmed wetland."

On August 16, 1990, PRI and Rogina representatives met with Corps representatives, hand delivering PRI's wetland report. The Corps requested that Hallmark fill out an

---

1. Congress rescinded the 1989 Manual in 1991. When the 1989 Manual was rescinded, the 1987 Corps of Engineers Wetlands Delineation Manual ("1987 Manual") was retroactively reinstated for the time period at issue.

"after-the-fact" permit application and provide a mitigation plan to address the loss of wetland area. On August 20, 1990, Hallmark submitted an application for Nationwide Permit 26 for the fill of less than ten acres of isolated waters. In the application, Hallmark proposed creation of new wetlands adjacent to the anticipated lake as its mitigation plan. Hallmark resubmitted the application on August 31, 1990. The Corps did not respond directly to Hallmark's application. Instead, the Corps concentrated on obtaining a mitigation plan for Area B.

Hallmark retained SDI Consultants, Ltd. ("SDI") to propose a mitigation plan, which was completed in 1995. SDI reviewed all historical data about Area B and, using the 1987 Manual, concluded Area B lacked wetland hydrology when farmed. SDI determined Area B did not require a mitigation plan because it was properly classified as "prior converted cropland" rather than a farmed wetland.

Upon receiving SDI's report in early 1996, the Corps forwarded the report to the Natural Resources Conservation Service ("NRCS"). In 1994, the Corps, NRCS, the Environmental Protection Agency, and the U.S. Fish and Wildlife Service signed a memorandum of agreement, making NRCS the lead agency with respect to wetland determinations on agricultural lands. NRCS reviewed PRI's report, SDI's report, and its own wetland map, prepared in 1987 or 1988. NRCS creates wetland maps based on examination of aerial photographs and historical data. Reviewing existing data, NRCS concluded Area B was a wetland.

Prior to receiving SDI's report, the Corps had already concluded Hallmark was in violation of the Clean Water Act. In a letter dated August 24, 1995, the Corps asserted Hallmark had discharged fill material into wetlands without a permit. Because the SDI delineation concluded Area B was not a wetland, Hallmark refused to comply with the Corps' request for a mitigation plan. Over the course of more than five years, the Corps repeatedly requested (and eventually demanded) that Hallmark provide an adequate mitigation plan to address the loss of wetlands. After attempts to resolve the dispute

proved unsuccessful, the Corps referred this matter to the United States Attorney.

## II FEDERAL JURISDICTION UNDER THE CLEAN WATER ACT

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1978). Section 301 of the Clean Water Act prohibits discharge of pollutants into navigable waters of the United States. 33 U.S.C. § 1311. Section 404 of the Clean Water Act authorizes the Corps to issue permits "for discharge of dredged or fill material into the navigable waters at specific disposal sites." Id. § 1344. The discharge of any pollutant is unlawful unless it complies with the Act's permit requirements. Id. § 1311(a).

### A. DISCHARGE OF A POLLUTANT

"Discharge" is defined as "any addition of any pollutant to navigable waters from a point source." Id. § 1362(12). The government argues Hallmark discharged a pollutant into Area B when it added sand and dirt in order to fill the area, as well as when it redeposited material to the area as a byproduct of its contractors' construction activities in clearing or leveling the area. Hallmark responds that it made no fill "addition" to Area B, but rather produced a net withdrawal in excavating for a storm water detention pond. Because Hallmark was excavating and not filling the area, any "discharge" of dredged material was merely "incidental fallback" from excavation. Incidental fallback refers to the minute redeposits that occur as a byproduct of excavation. When material removed from the water is returned to it in substantially the same spot as the initial removal, the material is termed "fallback."

In support of its argument, Hallmark cites a recent decision finding incidental fallback not a "discharge" within the purview of the Clean Water Act. In *National Mining Assoc. v. U.S. Army Corps of Eng'rs.*, the Court of Appeals for the District of Columbia determined that a straightforward interpretation of the statutory term "addition" could not reasonably "encompass the situation in which material is removed from the waters of the

United States and a small portion of it happens to fall back." 145 F.3d 1399, 1404 (D.C.Cir.1998). The court held incidental fallback did not constitute a discharge "[b]ecause incidental fallback represents a net withdrawal, not an addition, of material." *Id.*

The decision in *National Mining* invalidated the *Tulloch* rule, under which the Corps had claimed jurisdiction over incidental fallback. 145 F.3d at 1404–07. In response to the lawsuit of *North Carolina Wildlife Federation v. Tulloch,* Civ. No. C90–713–CIV–5–BO (E.D.N.C.1992), brought by environmental groups concerned with a developer's wetland activities, the Corps promulgated regulations addressing *de minimis* deposits. *National Mining,* 145 F.3d at 1402. As part of the settlement of that suit, the Corps agreed to issue more stringent rules governing the permit requirements for landclearing and excavation activities. *Id.* The resulting regulations, referred to as the *Tulloch* rule, secured *de minimis* deposits and incidental fallback under the Corp's permitting authority. *Id.* Specifically, the rule enlarged the Clean Water Act definition of "discharge" to include "[a]ny addition, *including any redeposit,* of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." 33 C.F.R. § 323.2(d)(1)(iii) (emphasis added).

■ The *National Mining* court found the *Tulloch* rule exceeded the Corps' statutory jurisdiction under § 404 of the Clean Water Act and upheld the district court's nationwide permanent injunction against enforcement of the *Tulloch* rule. *National Mining,* 145 F.3d at 1410. As a result, neither excavation nor incidental fallback or redeposit of material during excavation requires a § 404 permit. *Id.* Thus, the Corps has no jurisdiction over portions of Area B where the only discharge is in fact incidental fallback rather than a true addition of fill material. The government has not shown Hallmark added any fill material in its construction of the stormwater detention pond. Because it did not involve a discharge of dredged or fill material, construction of the stormwater detention pond is not subject to regulation under the Clean Water Act.

The stormwater detention pond comprises only part of Area B, however. Hallmark has admitted to filling and grading other parts of Area B in order to construct roads and upland lots for houses. Uncontested Facts ¶ 8. The clean dirt used to fill and grade parts of Area B constitutes a discharge under the Clean Water Act. If the government proves Hallmark discharged fill into waters of the United States, the Corps can assert jurisdiction over part of Area B.

**B. INTO A NAVIGABLE WATER**

Navigable waters are waters of the United States. 33 U.S.C. § 1362(7). Waters of the United States include bodies of water wholly within a state whose use or misuse could affect interstate commerce. 33 C.F.R. § 328.3(a)(3); *United States v. Riverside Bayview Homes,* 474 U.S. 121, 133, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The government alleges Area B is a water of the United States because it is an intrastate wetland with potential as a migratory bird habitat, therefore creating a substantial connection to interstate commerce. Hallmark rebuts the wetland status of Area B, as well as its use and potential as a migratory bird habitat.

**1. THE WETLAND STATUS OF AREA B**

■ The Corps previously has declared Area B a jurisdictional wetland. Accordingly, the court applies a deferential standard of review to that decision. The Corps' wetland determination cannot be set aside absent a finding its determination was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "To make this finding, the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

In order to subject Area B to Clean Water Act regulation, the government must prove Area B satisfies the jurisdictional requirements of either a "farmed wetland" or a

wetland under the 1987 Manual. The requirements the government must prove depends on the "normal circumstances" classification of the property. If farming was the normal circumstance for Area B, the government must prove it meets the criteria for a farmed wetland. Otherwise, the government must show Area B meets the three environmental requirements for wetland status pursuant to the 1987 Manual.

The normal circumstances of an area are determined on the basis of the land's characteristics and use, at present and in recent past. Corps' Regulatory Guidance Letter ("RGL") 90–7.[2] Because use may alter characteristics, the normal circumstance of an area's recent past may not be the same as the land's original, natural circumstance. *Id.* For instance, a naturally occurring prairie's normal circumstance might be farming if it has been converted to and used as cropland. *Id.* In determining the normal circumstance of a disturbed area, consideration is given to the extent and relative permanence of the physical alteration of wetlands hydrology and hydrophytic vegetation, as well as to the purpose and cause of the physical alterations. *Id.* If the physical alteration is merely an attempt to avoid regulation of the area, the change in normal circumstance will not prevent the Corps from asserting jurisdiction. *Id.*

At the time Hallmark began development, the evidence is uncontradicted that Area B's normal circumstance was farming. Hallmark began construction on the property in 1989. Prior to construction, John Kestel farmed the property continuously for nineteen years. Area B was cultivated yearly, and drain tiles were installed several feet beneath the ground to enable the growth of crops to maturity. Area B's change in natural circumstance occurred for the purpose of farming the land; no evidence suggests an ulterior motive of escaping regulation. In addition, the government acknowledges NRCS authority over Area B due to its

status as an agricultural land. Pl. Tr. Br. at 8. Because farmland was the normal circumstance for Area B, the government must prove Area B meets the requirements for a farmed wetland.

▆ To be classified as a farmed wetland, property must be inundated for fifteen or more days out of the growing season. RGL 90–7; 58 Fed.Reg. at 45031. Inundation of an area for less than fifteen days results in classification as "prior converted cropland." RGL 90–7. Prior converted cropland is exempt from federal jurisdiction. *Id.* The rationale behind the exemption lies in the degradation caused by farming activity:

> By definition, [prior converted] cropland has been significantly modified so that it no longer exhibits its natural hydrology or vegetation. Due to this manipulation, [prior converted] cropland no longer performs the functions or has the values that the area did in its natural condition. [Prior converted] cropland has therefore been significantly degraded through human activity and, for this reason, such areas are not treated as wetlands under the Food Security Act. Similarly, in light of the degraded nature of these areas, we do not believe that they should be treated as wetlands for the purposes of the [Clean Water Act].

58 Fed.Reg. at 45032. Because prior converted cropland no longer supplies the necessary hydrology or vegetation, its exclusion "from the definition of waters of the U.S. is consistent with EPA's and the Corps' paramount objective of protecting the nation's aquatic resources." *Id.*

At trial, the government was unable to carry its burden of proving that Area B qualifies as farmed wetland due to inundation for fifteen days or more. Kenneth Klick testified Area B was not inundated the day he visited the property to prepare his report for PRI. Because no government witness ever viewed Area B when it was inundated,

---

**2.** The government argues RGL 90–7 does not apply to this case. RGL 90–7 was issued in 1990 and expired in 1993. Although RGL 90–7 has expired, the Corps and the EPA have revised their regulations "to codify existing policy, as reflected in RGL 90–7." 58 Fed.Reg. 45008,

45031 (Aug. 23, 1993). RGL 90–7 provides guidance on the determination of "normal circumstances," as well as a thorough discussion on the jurisdictional status of "farmed wetlands." RGL 90–7 remains the definitive regulatory guideline for agricultural wetlands.

the government attempted to establish Area B's hydrology through aerial photography and evidence of a primary hydrology indicator. Much of the government evidence rested on speculation and conjecture.

Don Fehrenbacher, a government expert who works for the NRCS as a civil engineer, explained the methodology used in reading aerial photographs. Fehrenbacher testified the darker shadings in the photographs indicated inundation. Govt. Ex. 21, 22. Todd Soukup, an agronomy and soil expert, rebutted Fehrenbacher's interpretation of the darker areas in the photographs. According to Soukup, Area B exhibits a photo tone darker than surrounding higher-lying ground, but similar in tone to adjacent portions of the field to its east and north. Def. Ex. 37. In other words, some undisputedly non-inundated areas also appeared more darkly shaded, undermining Fehrenbacher's assertion that Area B's photo tone evidenced inundation. Soukup further testified that the darker tones are indicative of more moist soil conditions and higher organic matter contents, not necessarily inundation. Finally, even if the government's aerial photographs indicate potential inundation when they were taken, the photos were shot on a yearly basis and do not provide a reasonable basis for inferring that inundation occurred over a two-week period.

Moreover, the aerial photographs were of slight probative value when contrasted with the testimony of tenant farmer Kestel, who personally viewed the property on a daily basis. According to Kestel, the area was never inundated for more than three to five days at most. Kestel was the only witness to view Area B two or more consecutive days. Kestel also testified he successfully cropped Area B in eight out of ten years, a nearly impossible feat if the land was inundated for over two weeks during the growing season. Kestel was a pivotal witness. As the former tenant farmer of the property, he was the only witness who had personal knowledge of Area B. Kestel had no financial interest in the outcome of this litigation. Nor as a tenant of the farm did he receive any benefit from Hallmark's purchase of the property. In fact, Hallmark's purchase ousted Kestel from the land he successfully farmed for nineteen years. The court found Kestel to be a candid and credible witness.

In addition, Hallmark presented persuasive theoretical evidence that Area B could not be inundated for more than ten or eleven days. Rajesh Patel, an environmental engineer, produced a computer-modeled report that estimated the possible length of inundation in Area B, adjusted for various rainfall depths, soil permeabilities, and numbers of functioning drain tiles. Def. Ex. 38. Patel used the HEC–1 computer program in making his projections, the same computer program used by the Corps. According to Patel, a two-year storm[3] would result in only two to four days of inundation if two five-inch tiles were in place and working. Assuming no drain tiles, the possible inundation increases to only six or seven days. Both the NRCS and the Corps use the two-year storm as their marker in determining possible length of inundation for an area. Patel's computations reflect five potential flood events, from a one-year storm up to a hundred-year storm.[4] Even the hundred-year storm resulted in only four to seven days inundation assuming working drain tile, ten days without functioning tile.

Kestel testified the property was drained by functioning drain tiles, buried approximately thirty inches deep. He installed three six-inch drain tiles and two three-inch tiles in Area B, which he regularly repaired and maintained in working condition. Two twelve-inch drain tiles with a plastic surface inlet in Area B also had been placed underground prior to Kestel's tenancy. In making his computations, Patel assumed only two five-inch tiles, which would not drain the area as effectively as the tiles actually in place in Area B. However, even using conservative variables, the projected inundation with the two five-inch tiles never exceeds seven days.

---

**3.** A two-year storm is a level of rainfall (or flood event) that has a fifty percent chance of occurring in any given year.

**4.** A one-year storm is a level of rainfall expected once a year; a hundred-year storm is a flood event expected to occur only once every hundred years.

**1040**

The government argued the possible malfunctioning of the drain tiles, but did not controvert Kestel's testimony that he personally repaired the majority of the drain tiles placed under Area B in order to facilitate the growth of crops. More significantly, the government did not successfully rebut Patel's computations indicating that even with no working drain tiles, Area B would never be inundated more than ten or eleven days. In its own computations, the government projected, at most, a 14.9–day inundation for Area B. Govt. Ex. 34. This inundation projection still falls short of the fifteen-day requisite. Moreover, in reaching this 14.9–day projection, government expert Rick Woodford, an NRCS civil engineer, assumed nonfunctioning drain tiles and no surface inlet. But according to Kestel's credible testimony, both the drain tiles and the inlet were fully functioning.

Because the government has not proven the jurisdictional requirements for a farmed wetland, Area B is properly classified as prior converted cropland, exempting it from federal jurisdiction under the Clean Water Act. As Section 404 does not apply to Area B, no permits are necessary for dredging or filling activity on the property.[5]

In contrast to the fifteen-day inundation requirement for most farmed wetlands, prairie potholes, a specific type of wetland, need be inundated for only seven days to fall under Section 404 regulation. Theoretical projections suggest the potential (albeit remote) for inundation in excess of seven days during the growing season. At trial, however, the government did not establish Area B as a prairie pothole. In locating prairie potholes, the Corps follows the map of the United States Geological Survey ("USGS"), which designates prairie potholes in only five states: North Dakota, South Dakota, Minnesota, Montana, and Iowa. The NRCS's map allows for prairie potholes in northern parts of Illinois, as the area was subject to the Wisconsin glaciation, the same phenomenon responsible for formation of prairie potholes in the five USGS designated states. Pursuant

to a 1994 memorandum of agreement between several agencies, the Corps defers to the NRCS for wetland delineations on agricultural lands. Consistency in wetland delineation procedures is the purpose behind the 1994 agreement. 58 Fed.Reg. 45033. However, the Corps has final responsibility for Section 404 wetland delineations and must follow its own guidelines in wetland determinations. *Id.* Even if the Corps follows the NRCS map rather than the USGS map, the government decided not to present evidence on prairie potholes at trial. Since Area B has not been established as a prairie pothole, it is subject to the fifteen-day inundation requirement.

Even assuming *arguendo* farming was not the normal circumstance of Area B, the government failed to prove Area B met the three environmental requisites under the 1987 Manual. Before the Corps may assert jurisdiction over property, it must find the area satisfies the three wetland criteria of hydric soil, predominance of hydrophytic vegetation, and wetland hydrology or soil saturation/inundation. Govt. Ex. 14 at 13,14. Hallmark cast no significant doubt on Klick's findings of hydric soil and hydrophytic vegetation in Area B. However, the government was unable to establish the wetland hydrology of Area B by a preponderance of the credible evidence.

Wetland hydrology under the 1987 Manual requires either the appropriate inundation during the growing season or the presence of a primary indicator. Table 5 of the 1987 Manual indicates a nontidal area is not considered to evidence wetland hydrology unless the soil is seasonally inundated or saturated for 12.5% to 25% of the growing season. Govt. Ex. 14 at 36. In practical terms, an area must be inundated or saturated between 22.9 and 45.6 days during the 183–day growing season from April 15 to October 15. Obviously, if Area B does not meet the fifteen-day inundation requirement of a farmed wetland, it does not satisfy the greater re-

5. In reaching this conclusion, the court does not consider Def. Ex. 46—50, relating to the Corps' prior converted cropland determination on another development, Crestview Builders. The court finds that these exhibits have no probative value on the merits of the case, although they are cumulative evidence of the experience of Hallmark's expert, Tom Slowinski.

quirement of twenty-three days of inundation.

The 1987 Manual allows inference of wetland hydrology if a primary indicator is present. *Id.* at 36–41. The 1987 Manual lists six field hydrologic indicators, in order of decreasing reliability, as evidence that inundation and/or soil saturation has occurred: (1) visual observation of inundation; (2) visual observation of soil saturation; (3) watermarks; (4) drift lines; (5) sediment deposits; and (6) drainage patterns within wetlands. *Id.* at 37–41. Of the six possible indicators, the government presented evidence only of drift lines. Klick testified he observed a ring of flotsam in Area B the day he visited the site in 1990. A flotsam ring is created by dead or drowned vegetative debris deposited in a circular pattern where temporary inundation has occurred and receded. The government characterized flotsam as a type of drift line.

Hallmark's experienced expert and former Corps senior staff member, Tom Slowinski, opined that the drift lines referred to in the 1987 Manual do not apply to the flotsam Klick observed. The 1987 Manual definition of drift lines casts further doubt on the government's attempt to prove hydrology merely by the presence of flotsam. Placed fourth out of six indicators listed in order of decreasing reliability, drift lines are "most likely to be found adjacent to streams or other sources of water flow." *Id.* at 38. Area B is an isolated site, far from any other water source. Soukup explained that water standing for as little as a few days could leave the observed ring of flotsam as it drained from the basin. While flotsam is probative of the height reached by the water level, flotsam is not as probative of the length of time water remained in the basin. Obviously the two are correlated. But if an area is properly drained, as Area B appeared to be, flotsam would not be a reliable indicator of the time period of inundation. While the flotsam indicates Area B was at least temporarily inundated, the overwhelming evidence that Area B was not inundated for more than eleven days minimizes the probative value of flotsam as an indicator of wetland hydrology under the circumstances presented here.

Slowinski's twenty years of Corps experience merits significantly more weight than Klick's one-year wetland delineation experience when he surveyed Area B in 1990. Klick performed the delineation by himself; Slowinski testified it was Corps practice to send at least two engineers to a site, four if the site appeared complicated, in order to ensure a correct assessment. Furthermore, Klick's PRI report is riddled with inconsistencies and inaccurate conclusions, undermining his reliability as an expert witness. For instance, in delineating another possible wetland area ("Area A") on the property, Klick noted *Zea Mays*, which is not properly listed as a wetland plant. Govt. Ex. 18A. In his report for that area, however, Klick concluded Area A contained one-hundred percent wetland plants, satisfying the hydrophtic vegetation criterion. *Id.* Although Klick determined Area A was a wetland, the Corps ultimately decided Area A did not fall under its wetland jurisdiction. Because Slowinski and Soukup are more experienced and reliable witnesses, the court affords their testimony greater weight than that of Klick. Accordingly, the court concludes the presence of flotsam in Area B does not satisfy the hydrology criterion.

In sum, the record does not support the Corps' inference of hydrology and assertion of wetland jurisdiction over Area B. The Corps' conclusion was arbitrary and capricious because it was not based on a consideration of the relevant factors and evidence. Area B qualifies as prior converted cropland that does not meet the three environmental parameters of the 1987 Manual. Therefore, it is not subject to Section 404 regulation.

**2. CONNECTION TO INTERSTATE COMMERCE**

The government has also failed to prove Area B had a substantial connection to interstate commerce. Well-established use or special attractiveness as a migratory bird habitat creates a substantial connection to interstate commerce. *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 260–61 (7th Cir.1993). According to Kestel's testimony, birds did not use Area B. Although he testified he might have seen geese on a hill south of Area

B on one occasion, this single sighting does not demonstrate well-established use. The government produced shell casings recovered from Area B as evidence that birds had been hunted there. Govt. Ex. 23N. Kestel testified, however, that family members hunted pheasants on all parts of the farm. The evidence certainly did not suggest that pheasants are migratory birds or waterfowl. Kestel was an unbiased witness who was personally familiar with the property more than two decades. Indeed, there was no evidence presented that migratory birds ever actually used Area B.

Instead, the government attempted to establish the special attractiveness of Area B for birds. *Hoffman Homes* 999 F.2d at 260–61. The government pointed out the shallowness of Area B's ponding and the corresponding food supply of invertebrates. These two characteristics make the area attractive to certain bird species. Although Hallmark built a stormwater detention pond on part of Area B, Michael Johnson, a U.S. Fish and Wildlife biologist, testified the pond did not supply the same food resources found generally in Area B. However, even if the vegetation of Area B theoretically made the site attractive to migratory birds, there was no evidence that area was ponded over frequently or sufficiently long enough to serve as a wetland habitat.

## III NATIONWIDE PERMIT 26

In addition to arguing that Area B does not fall within the purview of the Clean Water Act, Hallmark asserted its activity in Area B was authorized by Nationwide Permit 26. The Clean Water Act provides that the Corps may issue general permits on a state, regional, or nationwide basis under certain circumstances. 33 U.S.C. § 1344(e). From 1980 through 1994, the Corps has administered five versions of Nationwide Permit 26, covering discharge of material into navigable waters of the United States that are either (1) above the headwaters, or (2) are other nontidal waters not part of a surface tributary system to interstate or navigable waters. Nationwide Permit 26 allows discharges affecting up to ten acres of either classification of navigable waters. *New*

*Hanover Tp. v. U.S. Army Corps of Engineers,* 992 F.2d 470 (3rd Cir.1993)(citing 33 C.F.R. § 330.5(a)(26)).

Anyone engaged in discharges that cause the loss or substantial adverse modification of one to ten acres of wetlands must notify the Corps' district engineer before discharge, but no pre-discharge notification is required for discharges causing the loss or substantial adverse modification of less than one acre of wetlands. *Id.* Although no pre-discharge notification to the district engineer is necessary for modifications affecting less than one acre, these modifications do require procurement of a state water quality certificate prior to the discharge. 33 C.F.R. §§ 330.5(b)(11), 330.9(a). Once a permittee submits a pre-discharge notification for fills between one and ten acres, the Corps' district engineer has 20 days to review the notification and issue a verification that the proposed project qualifies for a nationwide permit, sometimes with special conditions relating to mitigation. 51 Fed.Reg. 41206, *124 (Lexis) (Nov. 13, 1986). Failure of the Corps to respond within 20 days results in a waiver of the right to verify authorization. *Id.* A permittee must also submit a notice to the appropriate state agency for water quality certification under Section 401 of the Clean Water Act. 33 U.S.C. § 1341. The state water quality agency has sixty days to respond, or the project is deemed waived. *Id.*

In 1989 and 1990, when Hallmark worked in Area B, a Nationwide Permit 26 was in effect for discharges having "minimal impacts." *Id.* Area B is a nontidal area and not part of a tributary system, qualifying it for a nationwide permit. Prior to August 1990, Hallmark had altered only one acre of Area B. Uncontested Facts ¶ 16. Hallmark submitted its pre-discharge notification to the Corps on August 20, 1990, and again on August 31, 1990. Only the August 31 application was offered as an exhibit. Def. Ex. 9. Hallmark submitted its water quality certification to the Illinois Environmental Protection Agency on September 4, 1990. Def. Ex. 10; Govt. Ex. 67. Unless notified otherwise, Hallmark could deem its project authorized by the Corps on September 20, 1990, and by

the Illinois Environmental Protection Agency on November 3, 1990.

The government contends Laura Woodridge responded to Hallmark's application by requesting further information. Closing Argument at 26, citing Govt. Ex. 43A. However, the telephone conversation record supplied as Govt. Ex. 43A indicates that "Kathy," presumably Kathy Urquhart, a Corps engineer, telephoned Rogina on September 20, *1991*. The Corps' request for further information came a year too late.

Even if the Corps relinquished its right to deny Hallmark project authorization under Nationwide Permit 26, Hallmark must show it received state water quality authorization. Hallmark submitted its water quality application to the Illinois Environmental Protection Agency on September 4, 1990. Def. Ex. 10; Govt. Ex. 67. On September 21, 1990, Hallmark receive a request from the Illinois Department of Transportation, Division of Water Resources, for more information regarding Hallmark's August 20, 1990 application. Def. Ex. 24. On April 12, 1991, the Illinois Department of Transportation informed Hallmark its project did not require a Division of Water Resources permit. Def. Ex. 25.

■ Hallmark did not present any evidence concerning the relationship between the Illinois Environmental Protection Agency and the Illinois Department of Transportation. Hallmark's exhibits merely include an application to one agency, with apparent authorization from another. Without any evidence regarding the role of the Illinois Department of Transportation in granting state water quality certificates, this court cannot determine whether Hallmark has satisfied the requirements for Nationwide Permit 26. Therefore, the court finds Hallmark has not proven its activity in Area B was authorized by Nationwide Permit 26.

## IV  CONCLUSION ·

■ By enacting the Clean Water Act, Congress endeavored to restore and maintain the quality of the navigable waters of the United States. The restoration and preservation of wetlands is a significant component of our national policy. However, assertion of federal jurisdiction over a topographical depression in prairie land that had been successfully drained and converted to productive farmland for decades is an arbitrary and capricious application of the Clean Water Act. Accordingly, judgment shall be entered for the defendant Hallmark Construction Corporation and against the plaintiff United States.