**AMERICAN CIVIL LIBERTIES UNION, et al., Plaintiffs,**

v.

**Norman MINETA, et al., Defendants.**

**No. CIV.A. 04–0262(PLF).**

United States District Court,
District of Columbia.

June 2, 2004.

Hadrian R. Katz, Robyn Meredith Holtzman, Sidney A. Rosenzweig, Arnold & Porter, LLP, Washington, DC, for Plaintiffs.

Sara Wood Clash–Drexler, U.S. Department of Justice, Bruce P. Heppen, Office of the General Counsel, Washington, DC, for Defendants.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

This matter originally came before the Court on plaintiffs' motion for a preliminary injunction. That motion is now moot and has been replaced by a request for a permanent injunction in connection with plaintiffs' motion for summary judgment. The defendants also have filed a motion for summary judgment. Upon consideration of plaintiffs' motion for summary judgment, defendants' opposition, defendants' motion for summary judgment, plaintiffs' opposition, defendants' reply and the joint stipulation of material facts agreed to by the parties, the Court concludes that plaintiffs' motion for summary judgment should be granted and defendants' motion for summary judgment should be denied. A permanent injunction will issue.

## I. BACKGROUND

On or about January 23, 2004, President Bush signed into law the Consolidated Appropriations Act of 2004, Pub.L. No. 108–

199, 118 Stat. 3. Title II of Division F of the Act governs appropriations for the Department of Transportation, including mass transit systems. Section 177 of Division F ("Section 177") prohibits making any of the appropriated funds for mass transit available to "any Federal transit grantee after February 1, 2004, involved directly or indirectly in any activity that promotes the legalization or medical use of any substance listed in schedule I of section 202 of the Controlled Substances Act (21 U.S.C. 812 et seq.)." *See* Stipulated Statement of Material Facts ("Stip.") at ¶ 9. The Washington Metropolitan Transit Authority ("WMATA") is a federal transit grantee pursuant to 49 U.S.C. Chapter 53, and is eligible to receive federal funds under the Consolidated Appropriations Act of 2004. *See id.* at ¶ 3.

Plaintiffs—the American Civil Liberties Union, Change the Climate, Inc., the Drug Policy Alliance, and the Marijuana Policy Project—are nonprofit organizations that seek to participate in public debate on issues relating to marijuana laws and policy. *See* Stip. at ¶ 4. Some plaintiffs place advertising relating to marijuana laws and policy to advocate their positions. *See id.* at ¶ 5. Plaintiff Change the Climate submitted several advertisements to WMATA in the fall of 2003—prior to the effective date of the Act—which were displayed on and in buses and in Metrorail stations. *See id.* at ¶ 6. At least one of these advertisements had the subheading "Legalize and Tax Marijuana." *See id.* WMATA also has displayed Office of National Drug Control Policy anti-drug advertisements. *See id.* at ¶ 7.

On or about January 24, 2004, plaintiffs sought to purchase advertising space on the WMATA system for a specific advertisement entitled "Marijuana Laws Waste Billions of Taxpayer Dollars to Lock up Non–Violent Americans." *See* Stip. at ¶ 10; Motion of Plaintiffs for Preliminary Injunction ("Pl.Mot."), Exh. B. On or about February 5, 2004, WMATA informed plaintiffs that it had rejected plaintiffs' advertisement. *See* Stip. at ¶ 11. The parties agree that WMATA rejected the advertisement because of its concern about jeopardizing its federal funding. *See id.*

## II. DISCUSSION

Plaintiffs maintain that Section 177 violates their constitutional rights in multiple, independent ways:

(1) It imposes impermissible content– and viewpoint-based restrictions on speech in a public forum in an effort to silence one side's message in a serious political debate;

(2) it imposes restrictions that are unconstitutionally vague and overbroad; and

(3) it is an unlawful exercise of Congress' spending power because it violates an independent constitutional prohibition on the conditional grant of federal funds.

*See* Motion of Plaintiffs for Preliminary Injunction at 2. Plaintiffs seek an injunction that prohibits defendants Secretary of Transportation Norman Mineta and the United States from enforcing Section 177. *See id.* at 3.

### A. Construing Section 177 to Allow Advertisement

■ An Act of Congress ought not to be construed as violating the Constitution if any other possible construction remains available. *See, e.g., Rust v. Sullivan,* 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In light of this principle of constitutional avoidance, courts are required to construe congressional legislation, whenever possible, in a manner that avoids constitutional infirmities. *Turner v. District of Columbia Board of Elections*

*and Ethics,* 354 F.3d 890, 893 (D.C.Cir. 2004); *see also Rust v. Sullivan,* 500 U.S. at 190–91, 111 S.Ct. 1759. The language of the statute at issue in this case, however, is quite clear. A federal transit grantee that directly or indirectly promotes the legalization of a controlled substance sacrifices its federal funding under the Act. The constitutional questions raised by plaintiffs cannot be avoided because there is no way to construe Section 177 to allow mass transit grantees to display advertisements promoting the legalization of a controlled substance while still receiving federal funds.

The Conference Report accompanying the Act explained that Section 177 "prohibits Federal transit grantees from obligating or expending funds that would otherwise be available in the Act, if the grantee is involved directly or indirectly with any activity, including displaying or permitting to be displayed advertisements on its land, equipment, or in its facilities, that promote the legalization or medical use of substances listed in schedule I of section 202 of the Controlled Substance Act." H.R. CONF. REP. NO. 108–401, at 982 (2003), 2004 U.S.C.C.A.N. 3, 293. WMATA's posting of a given advertisement is clearly an "indirect" promotion of the message it contains. Neither party has suggested an alternate construction that would avoid this conclusion. Even if the language of the statute were seen as ambiguous regarding the provision of advertising space to public policy groups, the legislative history of the statute makes clear that the congressional intent was specifically to eliminate the type of advertisements implicated by this case. The Conference Report noted "with displeasure that public service advertising space in Washington, DC's Metropolitan Area Transit Authority rail stations and buses has been used to advocate changing the nation's laws regarding marijuana usage." *Id.* at 982, 2004 U.S.C.C.A.N. 3, 293.

There does not appear to be a reasonable statutory construction that can be used to avoid the constitutional questions raised by plaintiffs. Section 177 must be analyzed to determine whether it is unconstitutional under the First Amendment.

### B. Unconstitutionally Vague and Overly Broad

 Plaintiffs first argue that Section 177 is unconstitutionally vague and overly broad. Under the First Amendment, "speakers are protected from arbitrary and discriminatory enforcement of vague standards." *National Endowment for the Arts v. Finley,* 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). Although Section 177 contains some vague terms— "promote" and "indirectly . . . involved"— the essence of the provision is quite clear. Section 177 will be triggered, and the federal funding lost, if the transit grantee in any way—including by displaying, or permitting the display of, advertisements— endorses, or otherwise engages in activities that advocate the legalization of a controlled substance. Although "the fertile legal imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question," the statute here is written in clear and understandable language. *Terry v. Reno,* 101 F.3d 1412, 1421 (D.C.Cir.1996) (internal quotations and citations omitted).

 The courts are concerned with vague statutes in criminal and regulatory contexts where speakers—because they do not understand what the statute proscribes—will feel "compelled to steer too far clear of any 'forbidden area.'" *See National Endowment for the Arts v. Finley* 524 U.S. at 588, 118 S.Ct. 2168. A vague law "denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions." *Hastings v. Judicial*

*Conference of the United States,* 829 F.2d 91, 105 (D.C.Cir.1987). In this case, by contrast, there is fair notice and fair warning; it is quite clear what behavior will result in sanctions: the promotion of the legalization of controlled substances. Section 177 is not unconstitutionally vague.

■■■ "[A] law that is overbroad may be perfectly clear but impermissibly purport to penalize protected First Amendment activity." *Hastings v. Judicial Conference of the United States,* 829 F.2d at 105. Even a "clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). A statute is overly broad "only if 'it reaches a substantial number of impermissible applications,' " sweeping within its reach both protected and unprotected expression and conduct. *Terry v. Reno,* 101 F.3d at 1421 (quoting *New York v. Ferber,* 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

■■■ Although its legislative history indicates that Section 177 was intended to prevent advertising promoting the legalization of controlled substances, the language of the statute applies more broadly to all "activity" that "promotes," directly or indirectly, the legalization of a controlled substance. Plaintiffs suggest that the statute is overly broad because it could force WMATA to regulate the viewpoints of its customers. *See* Pl. Mot. at 13. The Court is unconvinced, however, that the sweep of Section 177 is sufficiently broad that WMATA could be seen as "promoting" the legalization of marijuana if, for example, a passenger (or many passengers) were to wear shirts or buttons endorsing that viewpoint. *See id.* Beyond that hypothetical, the Court has been presented with nothing "to indicate that the ordinance will have any different impact on any third parties' interests in free speech than it has on [plaintiffs]." *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. at 801, 104 S.Ct. 2118. Because plaintiffs have "failed to demonstrate a realistic danger that [Section 177] will significantly compromise recognized First Amendment protections of individuals not before the Court," it would be "inappropriate in this case to entertain an overbreadth challenge." *Id.* In any event, because the Court has determined that Section 177 is an unconstitutional exercise of Congress' spending power, *see infra* at Part D, it is unconstitutional in all its applications and therefore an overbreadth analysis is unnecessary.

## C. *Viewpoint– and Content–Based Discrimination*

■■■ Plaintiffs' primary argument is that Section 177 is unconstitutional because it is a content-based restriction on speech that discriminates against a particular viewpoint. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). As a result, content-based regulations of speech are constitutional only if they withstand strict scrutiny. *See United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). To be constitutionally permissible, such re-

strictions must be narrowly tailored to promote a compelling government interest. *See id.* "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Id.* at 816, 120 S.Ct. 1878.

 Restrictions on the basis of a particular viewpoint are even more suspect than viewpoint-neutral content-based restrictions. When the government targets particular viewpoints taken by speakers, "the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. at 829, 115 S.Ct. 2510. Viewpoint discrimination is "an egregious form of content discrimination," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Id.* The government therefore violates the First Amendment where it "denies access to a speaker solely to suppress the point of view [the speaker] espouses on an otherwise includible subject." *Cornelius v. NAACP,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

 Section 177 is not a viewpoint-neutral restriction. It does not seek to stop the mass transit grantee from expressing all views about controlled substances; rather, it prohibits only the promotion of the "legalization or medical use" of any controlled substance. While there is wider latitude to exclude certain subject matter in so-called nonpublic forums and in designated but limited public forums than there is in traditional public forums like public streets and parks, *see infra* at Part D.2.a., even that exclusion still must be viewpoint-neutral. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 48, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (permitting the exclusion of rival union material from school teachers' mailboxes because there was "no indication that the School Board intended to discourage one viewpoint and advance another"). Assuming that WMATA is a nonpublic or a designated but limited public forum, and that WMATA therefore would have latitude to exclude classes of speech, a direct restriction of the type contained in Section 177—an exclusion of a subclass of speech espousing a particular point of view—still would be presumptively invalid because it is not viewpoint neutral. *See id.* at 49, 103 S.Ct. 948; *Cornelius v. NAACP,* 473 U.S. at 806, 105 S.Ct. 3439.

 The tenets discussed above, however, assume a direct restraint on speech. Were the Court presented with a government regulation that directly placed prohibitions on speech advocating the legalization of marijuana, but allowed the opposite point of view, that regulation unquestionably would be unconstitutional. For example, if WMATA, a government actor, had a policy of accepting advertisements promoting increased sentences for drug offenders, but refusing advertisements advocating the legalization of controlled substances, such a regulation would be unconstitutional. This case, however, does not present the issue of such a direct regulation on speech. Instead, Congress seeks to affect the views expressed on WMATA's buses, bus stops, subway cars and subway stations through its spending power. The constitutionality of that type of restriction is not so easily determined. Because this case involves a condition placed by Congress on a federal appropriation, plaintiffs' argument that Section 177 is unconstitutional because it is facially viewpoint discriminatory cannot be addressed independently from the doctrine surrounding the exercise of the congressional spending power.

### D. Congressional Spending Power

 While the reach of Congress' spending power is broad and Congress

may impose conditions on the funds it appropriates, there are several general restrictions on Congress' exercise of its spending power: (1) the exercise must be in pursuit of the general welfare, (2) any conditions placed on the funds must be unambiguous, (3) the conditions may be illegitimate if they are unrelated to the federal interest in particular national projects or programs, and (4) there may not be an independent constitutional bar to the conditions imposed. *See South Dakota v. Dole*, 483 U.S. 203, 207–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Only the third and fourth of these restrictions are at issue in this case. *See* Reply Brief of Plaintiffs in Support of their Motion for Summary Judgment and in Opposition to Defendants' Cross Motion for Summary Judgment ("Pl.Rep.") at 4.[1]

### 1. Relation to Federal Interest

■ Plaintiffs argue that Section 177 is illegitimate because it is unrelated to the purpose of the appropriation, the funding of mass transit. *See* Pl. Mot. at 15. The Supreme Court noted in *Dole* that "our cases have suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *South Dakota v. Dole*, 483 U.S. at 207, 107 S.Ct. 2793; *see also Ivanhoe Irrigation Dist. v.*

*McCracken*, 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

Although Congress does have an interest in ensuring that federal funds are not used to facilitate activity that Congress does not wish to promote, the suppression of messages aimed at legalizing controlled substances seems quite far removed from the government's interest in funding and promoting mass transit. Defendants maintain that "Congress may permissibly decide that federally-funded equipment or facilities may not be used to facilitate or promote activity that is contrary to federal law or that may encourage, even in subtle ways, conduct that Congress has found poses a significant threat to the public welfare." Def. Mot. at 16. By way of example, the government cites cases upholding funding restrictions in the context of anti-discrimination statutes. *See Davis v. Monroe County Board of Education*, 526 U.S. 629, 640–42, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (recipients of federal funding must comply with Title IX); *Lau v. Nichols*, 414 U.S. 563, 568, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (school districts accepting federal funding must comply with Title VI); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir.2002) (recipients of federal funding must comply with Religious Land Use and Institutionalized Persons Act).

---

**1.** In a footnote in their reply brief, plaintiffs belatedly argue that the government's suggestion that the federal transit grantees can constitutionally comply with Section 177 by refusing, from this point forward, to carry *any* political advertising, raises questions regarding whether the statute is in pursuit of the general welfare and whether it is sufficiently unambiguous to allow the grantees knowingly to choose a course of action, " 'cognizant of the consequences of their participation.' " *See* Pl. Rep. at 4 n. 2 (quoting *South Dakota v. Dole*, 483 U.S. at 207, 107 S.Ct. 2793). As the Court noted in *Dole*, however, the concept

of what is in the general welfare is shaped by Congress and the courts should "defer substantially to the judgment of Congress." *See South Dakota v. Dole*, 483 U.S. at 208, 107 S.Ct. 2793. Here, Congress has determined that it is in the interest of the general welfare to oppose the legalization of controlled substances. With respect to the second restriction, the conditions upon which the federal transit grantees receive the funds "could not be more clearly stated by Congress." *Id.* The Court is satisfied that neither of these restrictions calls into question the legitimacy of Section 177.

While it hardly seems analogous to equate statutes that condition federal funding on compliance with anti-discrimination statutes with a statute intended to suppress a particular political viewpoint on subways and buses, it nevertheless is clear under the case law that the connection between the funding restriction and the purpose of the funding does not have to be particularly closely related to withstand a challenge. *See Davis v. Monroe County Board of Education,* 526 U.S. at 640–42, 119 S.Ct. 1661 (recipients of federal funding must comply with Title IX); *South Dakota v. Dole,* 483 U.S. at 207–08, 107 S.Ct. 2793 (receipt of federal highway funds can be conditioned on adoption of a minimum drinking age of 21); *Lau v. Nichols,* 414 U.S. at 568, 94 S.Ct. 786 (school districts accepting federal funding must comply with Title VI); *Mayweathers v. Newland,* 314 F.3d at 1067 (recipients of federal funding must comply with Religious Land Use and Institutionalized Persons Act); *State of Oklahoma v. Schweiker,* 655 F.2d 401, 406 (D.C.Cir.1981) (states' receipt of federal Medicaid funds permissibly conditioned on their "passing through" to recipients annual cost-of-living increases approved by Congress). This Court has found no case, and plaintiffs have cited none, striking down a condition on federal funding solely because it was insufficiently related to the federal interest in the program funded.[2]

### 2. Independent Constitutional Bar

#### a. Mass Transit Grantees' Compliance with Section 177

■ A condition imposed on the receipt of federal funds may be impermissible where there is an independent constitutional provision which is violated by the condition. *See South Dakota v. Dole,* 483 U.S. at 208, 107 S.Ct. 2793 ("[W]e have noted that other constitutional provisions may provide an independent bar to the conditional grant of federal funds."). The "independent constitutional bar" prong of *Dole* requires that the spending power "not be used to induce the states [or local authorities] to engage in activities that would themselves be unconstitutional." *Id.* at 210, 107 S.Ct. 2793. Plaintiffs contend that the First Amendment poses an independent constitutional bar to the enforcement of Section 177. *See* Pl. Mot. at 14. Defendants respond that plaintiffs can prevail only by demonstrating that Section 177 is incapable of being implemented by WMATA in a constitutional manner. *See* Def. Opp. at 2, 10–11. They also argue that WMATA and other mass transit systems are not First Amendment forums and therefore may choose not to accept the advertisements in question. *See id.* at 9–10.

■ The Supreme Court has recognized that there are three types of forums that may be implicated in a First Amendment analysis: (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic forum. A traditional public forum is one that has traditionally been available for public expression, such as public streets and parks, and any restriction on speech in such a forum is subject to strict scrutiny. *See International Society for Krishna Consciousness v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *Perry Education*

---

**2.** WMATA filed a notice of a related case, *Barbour v. WMATA,* No. 03–7044 (argued Feb. 10, 2004) currently pending before the court of appeals. WMATA noted that the third restriction under *Dole* was addressed by the parties' appellate briefs and at oral argument in that case. The Memorandum Opinion issued by Chief Judge Hogan, however, makes no mention of that issue, and no decision has yet been issued by the court of appeals. This Court therefore can take no guidance from *Barbour.*

*Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. at 45, 103 S.Ct. 948. A designated public forum consists of property not traditionally open for assembly and debate but that has been opened for expressive activity by part or all of the public. *See International Society for Krishna Consciousness v. Lee,* 505 U.S. at 678, 112 S.Ct. 2701. It may be either limited or unlimited in character. *See id.* The standards for designated public forums are the same as those governing traditional public forums. *See id.* So long as the designation as public remains, the government "is bound by the same standards as apply in a traditional public forum." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. at 46, 103 S.Ct. 948. All remaining public properties are nonpublic forums, and content-neutral limitations on speech therein must survive "only a much more limited review." *See International Society for Krishna Consciousness v. Lee,* 505 U.S. at 678–79, 112 S.Ct. 2701. If the buses, subway cars and subway stations at issue here are either nonpublic or designated public forums, then WMATA has greater latitude to exclude speech.

Whether a mass transit facility is a traditional public forum, a designated public forum (limited or unlimited), or a nonpublic forum depends on the characteristics of the forum. In a plurality opinion, four justices of the Supreme Court agreed that "car card" advertising spaces on public buses and streetcars were not a traditional public forum and that a transit system therefore legitimately could decline political advertising while accepting commercial advertising. *See Lehman v. City of Shaker Heights,* 418 U.S. 298, 301–02, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). The plurality noted that there were "no open spaces, no meeting hall, park, street corner, or other public thoroughfare" implicated in the case. *Id.* at 303, 94 S.Ct. 2714. The opinion compared the advertising spaces to a newspaper or television station that was under no obligation to accept every proffer of advertising from the general public. *Id.* The concurring justice, who provided the fifth vote for affirmance, found no constitutional right to spread a message before "a captive audience" on the city's buses. *See id.* at 308, 94 S.Ct. 2714 (Douglas, J., concurring). As Justice Douglas noted:

> [A] streetcar or bus is plainly not a park or sidewalk or other meeting place for discussion, any more than is a highway. It is only a way to get to work or back home. The fact that it is owned and operated by the city does not without more make it a forum.... [I]f we are to turn a bus or a streetcar into either a newspaper or a park, we take great liberties with people who because of necessity become commuters and at the same time captive viewers or listeners.

*Id.* at 306–07, 94 S.Ct. 2714. The Supreme Court's decision in *Lehman* makes clear that WMATA's buses are nonpublic forums. Following the reasoning in *Lehman,* the Court concludes that WMATA's subway cars likewise are nonpublic forums.

The Court therefore turns to the more difficult question of the subway stations themselves. It is not disputed that WMATA in the past has accepted public issue advertisements, and that WMATA has chosen to "convert[ ] its subway stations into public fora by accepting other political advertising." *Lebron v. WMATA,* 749 F.2d.893, 896 (D.C.Cir.1984); *see also Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1391 (D.C.Cir.1990) (above-ground areas of WMATA stations are public forums, either traditional or by designation). The court in *Lebron* specifically declined to determine whether WMATA stations were traditional or designated public forums. Judge Bork, who wrote the

opinion, noted that WMATA's ability to impose content-based restrictions on its advertising spaces "depends upon whether subway stations are more akin to airports or to public buses." *See Lebron v. WMATA,* 749 F.2d at 899 (citations omitted). Judge Bork was distinguishing between the Supreme Court's decision in *Lehman* and the D.C. Circuit's later decision in *Southwest Africa/Namibia Trade and Cultural Council v. United States,* which held that airports, unlike buses, were public forums and that it therefore was unconstitutional to exclude political and issue-oriented advertisements. *See Southwest Africa/Namibia Trade and Cultural Council v. United States,* 708 F.2d 760, 767 (D.C.Cir.1983).

▮▮▮ The necessity for the airport/bus distinction was eliminated by the Supreme Court's decision in *International Society for Krishna Consciousness v. Lee,* which resolved a split in the circuits and concluded that an airport terminal, like a bus, was a nonpublic forum. *See International Society for Krishna Consciousness v. Lee,* 505 U.S. at 683, 112 S.Ct. 2701. Although the Court in *Lee* was careful to explain that the opinion applied specifically to airports and that "[t]o blithely equate airports with other transportation centers ... would be a mistake," *id.* at 682, 112 S.Ct. 2701, this Court is satisfied that reading *Lee* in connection with *Lehman,* the WMATA subway stations are, like buses and airport terminals, nonpublic forums. *See also Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transportation Authority,* 148 F.3d 242, 248 (3d Cir. 1998) (advertising space in subway stations and bus stops "clearly does not constitute

a 'traditional' public forum, archetypal examples of which include streets and parks"). A subway station does not have as "a principal purpose ... the free exchange of ideas," the hallmark of a traditional public forum. *Cornelius v. NAACP,* 473 U.S. at 800, 105 S.Ct. 3439. Nor can plaintiffs make the argument that subway stations "have historically been made available for speech activity." *International Society for Krishna Consciousness v. Lee,* 505 U.S. at 681, 112 S.Ct. 2701. Furthermore, no less than on subway cars, streetcars and buses, passengers on subway platforms and in Metrorail stations are a "captive audience." *See Lehman v. City of Shaker Heights,* 418 U.S. at 308, 94 S.Ct. 2714 (Douglas, J., concurring). The advertising spaces at issue in this case—buses, subway cars, and subway stations—are non-public forums which WMATA over the years has chosen to designate as limited public forums.[3]

▮▮▮ The government argues that a mass transit grantee's decision to open itself up as a designated public forum cannot invalidate otherwise constitutional funding restrictions enacted by Congress. *See* Def. Mot. at 11; Def. Reply at 9–10. The Court agrees. WMATA's choice to open itself as a designated public forum is not dispositive and certainly not binding on Congress as it makes funding decisions. So long as a designated public forum remains open, it is bound by the same standards as apply in a traditional public forum, but "a State is not required to indefinitely retain the open character of the facility." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. at

---

**3.** Although one could distinguish bus shelters from subway stations and say that the bus shelters are public forums because they are simply structures standing on city sidewalks, the essential character making subway stations and airports nonpublic forums—that

they are simply terminals for entering and exiting a mass transit system to which people go not for leisure or entertainment but for transportation—is present equally in the case of the bus shelters.

45, 103 S.Ct. 948; *see also DiLoreto v. Downey Unified School District Board of Education*, 196 F.3d 958, 970 (9th Cir. 1999) (decision to stop placing advertising on fence at school rather than accept advertisement including Ten Commandments was not impermissible viewpoint discrimination); *Chabad–Lubavitch of Georgia v. Miller*, 5 F.3d 1383, 1394 (11th Cir.1993) (to avoid perception that it is endorsing religion, state may close capitol rotunda as a forum). Because the buses, subway cars and subway stations have been designated by WMATA as public forums, it would be constitutionally sound for WMATA, in accordance with *Perry*, to now choose to limit, in a viewpoint-neutral manner, access to those spaces. *See* Def. Mot. at 10–11; *see also Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (government could have adopted content-neutral policy prohibiting certain types of displays entirely); *see id.* at 783–84, 115 S.Ct. 2440 (Souter, J., concurring) (state may close capitol lawn to all unattended private displays); *Grossbaum v. Indianapolis–Marion County Building Authority*, 100 F.3d 1287, 1298–99 (7th Cir.1996) (holding that motive of government when it imposes content-neutral regulation on speech in nonpublic forum is irrelevant).[4]

The Court is satisfied that it is possible for WMATA and the other mass transit grantees to comply with the restrictions of Section 177 by implementing certain advertising policy changes without themselves violating the First Amendment.[5]

b. Viewpoint Discrimination

 Because this Court has concluded that it is possible for WMATA to comply with Section 177 without running afoul of the First Amendment, the question becomes whether it was permissible for Congress to enact the type of viewpoint-based funding restriction found in Section 177.

The Supreme Court has held that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. at 193, 111 S.Ct. 1759 (rejecting constitutional challenge where Congress appropriated federal funding for family planning services, but prohibited grantees from discussing abortion in family planning context). The Supreme Court has allowed viewpoint-based funding restrictions in situations in which the government itself is the speaker or in which the government is using private speakers to transmit information pertaining to its own programs and

4. Plaintiffs' reliance on cases striking down other mass transit authorities' viewpoint-based advertising policies is inapposite. Certainly, many courts have held, as already noted, that once the state opens up mass transit as a public forum, it cannot discriminate on the basis of viewpoint. *See Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transportation Authority*, 148 F.3d at 255; *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Authority*, 767 F.2d 1225, 1232–33 (7th Cir.1985); *National Abortion Federation v. Metropolitan Atlanta Rapid Transit Authority*, 112 F.Supp.2d 1320, 1326 (N.D.Ga. 2000). The question at issue here, however, is not whether WMATA can constitutionally

prefer one viewpoint over another—the presumption is that it cannot—but whether WMATA can close itself as a designated public forum and thus constitutionally refuse to accept the advertisements in question by eliminating entire categories of advertisements. The answer is that it can.

5. The Court declines to consider, in the context of this facial challenge, what new advertising policy would both meet the requirements of Section 177 while also satisfying the level of scrutiny inherent in content-based restrictions in a designated public forum.

policies. *See Legal Services Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (citing *Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 229, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), and *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. at 833, 115 S.Ct. 2510). The Court recognizes that "when the government appropriates public funds to promote a particular policy of its own, it is entitled to say what it wishes," and that when "the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Legal Services Corp. v. Velazquez*, 531 U.S. at 542, 121 S.Ct. 1043 (quoting *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. at 833, 115 S.Ct. 2510).[6] The Supreme Court views these situations as a constitutional refusal by the government to subsidize certain speech, rather than an unconstitutional "penalty" on that speech. *See United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 123 S.Ct. 2297, 2308, 156 L.Ed.2d 221 (2003); *Rust v. Sullivan*, 500 U.S. at 193, 111 S.Ct. 1759.

■■■ The Supreme Court distinguishes between the government acting as speaker or using public funds to convey the government's own message and the government simply funding private speech. In the first instance, viewpoint discrimination is constitutional; in the second, it is not. *See Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. at 834, 115 S.Ct. 2510. "[I]t does not follow ... that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a mes-

sage it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834, 115 S.Ct. 2510 (refusal by state university to pay costs for religious student publication where other student publications were subsidized constituted unconstitutional viewpoint discrimination). Viewpoint-based restrictions are unconstitutional not only when the government intends to fund a diversity of speech, but whenever the funding is "designed to facilitate private speech, not to promote a governmental message." *Legal Services Corp. v. Velazquez*, 531 U.S. at 542, 121 S.Ct. 1043. Because the Legal Services lawyer in *Velazquez* was "not the government's speaker," and the attorney's advocacy in court "cannot be viewed as governmental speech," *id.* at 542, 121 S.Ct. 1043, neither of the two limited situations where viewpoint-based funding restrictions are permissible was implicated.

This case is not about the government funding speech, private or otherwise. While the government was in some sense speaking through the providers in *Rust*, in no way is it speaking through WMATA. Nor is the government funding private speech as in *Velazquez*. In fact, the transit grants are not made for encouraging speech *at all*. There can be no legitimate argument that the government is "speaking" through its funding of capital improvements to mass transit facilities or that the grant of funds for mass transit is "designed" to facilitate private speech. The type of funding at issue here is more closely akin to that found in the *American Library Association* case where the federal government appropriated funds for public libraries to provide Internet access with certain strings attached. At issue in that case was the Children's Internet Protec-

---

**6.** The Court in *Velazquez* characterized *Rust* as one of those cases in which the government "used private speakers to transmit infor-

mation pertaining to its own program." *Legal Services Corp. v. Velazquez*, 531 U.S. at 541, 121 S.Ct. 1043.

tion Act ("CIPA"), which provided that a public library could not receive federal assistance to provide Internet access unless it installed software to block images that constitute obscenity or child pornography and to prevent minors from obtaining access to material that is harmful to them. *See United States v. American Library Ass'n, Inc.*, 123 S.Ct. at 2301. The Supreme Court upheld this restriction on funding as constitutionally permissible.

There are two lines of reasoning in *American Library Association* that arguably could support the constitutionality of Section 177. First, the plurality opinion implies that the viewpoint-based restrictions struck down two years earlier in *Velazquez* were found improper because the program was "designed to facilitate private speech," whereas the library Internet terminals in *American Library Association* were not designed to facilitate speech at all. *See United States v. American Library Ass'n, Inc.*, 123 S.Ct. at 2309 n. 7. Second, the plurality states that the principles of forum analysis and heightened scrutiny are not applicable in contexts such as public libraries because they are not forums for speech, the public expression of ideas, and discourse at all, but places that provide resources to facilitate research and learning. *See United States v. American Library Ass'n, Inc.*, 123 S.Ct. at 2304–05; *id.* at 2308 ("The E-rate and LSTA programs were intended to help public libraries fulfill their traditional role of obtaining material of requisite and appropriate quality for educational and informational purposes."). In support of this view, the Court cited its decisions in *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 672–73, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (public television station may make content-based editorial judgments regarding the private speech it presents to its viewers), and *National Endowment for the Arts v. Finley*,

524 U.S. at 569, 583, 118 S.Ct. 2168 (upholding funding provision requiring NEA to use content-based funding criteria, but noting that "decency and respect" criteria "do not silence speakers by expressly 'threaten[ing] censorship of ideas' " or permit agency to engage in viewpoint discrimination). The Court recognized that it was essential to the functioning and traditional missions of the organizations involved in *American Library Association, Forbes*, and *Finley* to allow them to make value-based, and thus content-based—but not, importantly, viewpoint-based—decisions. *See United States v. American Library Ass'n, Inc.*, 123 S.Ct. at 2304.

The two justices who concurred in *American Library Association*, Justice Kennedy and Justice Breyer, did not adopt the plurality opinion's disavowal of the heightened scrutiny generally associated with the First Amendment. Justice Kennedy noted that librarians were able to unblock filtered material on request and therefore access was not burdened "in any significant degree." *United States v. American Library Ass'n, Inc.*, 123 S.Ct. at 2310 (Kennedy, J., concurring). He also noted that all the members of the Court appeared to agree that the interest protected, shielding minors from obscenity, was "legitimate, and even compelling." *Id.* Justice Breyer would have applied heightened (but not strict) scrutiny to the statute because it raises "special First Amendment concern[s]," and he would not have started from a presumption of constitutionality. *See id.* at 2310 (Breyer, J., concurring). He found, however, that because the patron could request that the filter be removed, there was a "comparatively small burden" on the patron that was not "disproportionate" when considered in relation to the Act's legitimate objectives. *Id.* at 2312. Furthermore, as the plurality noted, the filters in *American Library Associa-*

*tion* were aimed at blocking access to child pornography, obscenity and other unprotected speech. *See United States v. American Library Ass'n, Inc.*, 123 S.Ct. at 2306. The blocking of protected material was an unintended side effect of the application of the filter and could be remedied upon a user's request. *See id.* Though content-based, the restriction was viewpoint-neutral.

Unlike the statute at issue in the *American Library Association* case, Section 177 is a restriction on the expression not just of content, but of a certain viewpoint. Section 177 does not express Congress' desire to shield the nation's youth from *all* conversation regarding controlled substances, but rather eliminates only dialogue regarding legislative reform of the narcotics laws, and the prohibition applies to minors and adults alike. Because of its lack of viewpoint neutrality, it cannot survive a heightened scrutiny analysis, which is still required after *American Library Association*, and neither *American Library Association* nor *Finley* is support for its constitutionality. The government has articulated no legitimate state interest in the suppression of this particular speech other than the fact that it disapproves of the message, an illegitimate and constitutionally impermissible reason. As the Court said in *Velazquez*: "When private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal*

*Services Corp. v. Velazquez*, 531 U.S. at 548–49, 121 S.Ct. 1043 (citing *Regan v. Taxation with Representation of Washington*, 461 U.S. at 548, 103 S.Ct. 1997) ("The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim at the suppression of dangerous ideas.' ") (quoting *Cammarano v. United States*, 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959)).[7] "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Legal Services Corp. v. Velazquez*, 531 U.S. at 548, 121 S.Ct. 1043.[8]

 While Congress may be under no obligation to fund mass transit or other entities that rely also on advertising revenues for their survival, once it chooses to do so, it must act in a way that does not engage in viewpoint discrimination in violation of the First Amendment. *See Legal Services Corp. v. Velazquez*, 531 U.S. at 548, 121 S.Ct. 1043. Just as Congress could not permit advertisements calling for the recall of a sitting Mayor or Governor while prohibiting advertisements supporting retention, it cannot prohibit advertisements supporting legalization of a controlled substance while permitting those that support tougher drug sentences. The Court concludes that because Section 177 is viewpoint-discriminatory, it is an unconstitutional exercise of Congress' broad

---

7. In *Rust,* the majority noted that the Court's earlier "unconstitutional conditions" cases involved "situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program," a situation very much like the one presented here. *Rust v. Sullivan*, 500 U.S. at 197, 111 S.Ct. 1759 (emphasis in original).

8. *Velazquez* is important not just because of its reasoning and holding, but because the two decisive Justices in *American Library Association*—concurring Justices Kennedy and Breyer—were in the majority in *Velazquez,* a 5–4 decision in which Justice Kennedy wrote the opinion for the Court. Reading these two decisions in harmony leads to the result here.

spending power under the test established in *South Dakota v. Dole.*[9]

### E. Permanent Injunction

■ In determining whether to enter a permanent injunction, the Court considers a modified iteration of the factors it utilizes in assessing preliminary injunctions: (1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction. *See National Ass'n of Psychiatric Health Systems v. Shalala,* 120 F.Supp.2d 33, 44 (D.D.C.2000). *See also Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *National Mining Ass'n v. U.S. Army Corps of Engineers,* 145 F.3d 1399, 1408–09 (D.C.Cir.1998) (demonstration of actual success on the merits required for permanent injunctive relief).

■ As discussed in the previous section, the Court concludes that plaintiffs are correct on the merits. As for irreparable injury, "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Branch v. FCC,* 824 F.2d 37 (D.C.Cir.1987) (quoting *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49

L.Ed.2d 547 (1976)); *see also PETA v. Gittens,* 215 F.Supp.2d 120, 134 (D.D.C. 2002). Where the injury is both "threatened" and "occurring" at the time of the motion for an injunction and plaintiff is successful on the merits, injunctive relief is appropriate relief for a First Amendment violation. *Elrod v. Burns,* 427 U.S. at 373–74, 96 S.Ct. 2673.

There is no significant harm that will occur if the injunction is granted and there is a clear public interest in preventing the chilling of speech on the basis of viewpoint. Because plaintiffs have prevailed on the merits, permanent injunctive relief is the appropriate remedy in this matter.

An Order and Judgment consistent with this Opinion shall issue this same day.

SO ORDERED.

### ORDER AND JUDGMENT OF INJUNCTIVE RELIEF

Upon consideration of plaintiffs' and defendants' cross-motions for summary judgment, and of the declarations, exhibits and legal memoranda filed in support thereof and in opposition thereto, and of the arguments of counsel, and of the entire record in this action, and for the reasons stated in the separate Opinion issued this same day, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction [3] is DENIED as moot; it is

FURTHER ORDERED that plaintiffs' motion for summary judgment and permanent injunction [9] is GRANTED and de-

---

**9.** The Court acknowledges that certain of plaintiff's advertisements previously displayed by WMATA were significantly more controversial than the advertisement contained in Exhibit B of the plaintiffs' motion and that the subject matter may have been quite objectionable to parents and other daily commuters. The distasteful nature of certain advertise-

ments chosen by plaintiffs does not, however, make them unprotected speech. *See United States v. Playboy Entertainment Group, Inc.,* 529 U.S. at 811, 120 S.Ct. 1878 ("we shall assume that many adults themselves would find the material highly offensive," but "Playboy has [the right] under the First Amendment to transmit it.").

fendants' motion for summary judgment [15] is DENIED; it is

FURTHER ORDERED that defendant Norman Mineta, in his official capacity as Secretary of Transportation, and defendant United States, and their respective officers, employees, representatives, and agents are enjoined from enforcing Section 177 of Division F of the Consolidated Appropriations Act of 2004, Pub.L. No. 108–199, 118 Stat. 3; and it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL JUDGMENT in this case. This is a final appealable order. *See* Rule 4(a), Fed. R.App. P.

SO ORDERED.